Joseph F. Fields, (JF 0040)
Edward Tessler (ET 4503)
David L. Elkind (DE 5559)
Dickstein Shapiro LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

Attorneys for Defendant
Jaine Elkind Eney

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x
                     :

ALLAN S. LARSON          :

                 :

        Plaintiff,    :    CASE NO. 08 CV 3513 (DC)

                 :

    v.             :    AFFIDAVIT OF JAINE ELKIND ENEY

                 :

JAINE ELKIND ENEY    :

                 :

        Defendant.   :

                 :

- - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK     )
                       ) ss:
COUNTY OF WESTCHESTER )

        JAINE ELKIND ENEY, being duly sworn, deposes and says:

        1.    I am the defendant in the above matter. I make this affidavit, on personal knowledge, in support of Defendant's Motion to Dismiss the Complaint.

        2.    Although the Complaint was never served upon me, I have reviewed the version, without exhibits, that was sent to me by Mr. Larson's main counsel, Denise Guzman, of the firm of Guzman & Lou, LLP, in Manhattan Beach, California, on May 14, 2008. A true and correct copy of Ms. Guzman's letter, with the Complaint, is attached as Exhibit 1. The Complaint contains numerous factual errors. As set forth below, the most important error is that

six months before Ms. Guzman's letter, I had reached an agreement with Ms. Guzman that $150,000 of the advances were to be treated as a loan to be repaid by me under specific terms, and secured by my residence.

      3.    In order for the Court to understand how these advances arose, the Court needs to understand the long-term relationship between Mr. Larson and me.

      4.    I first met Mr. Larson in 1972, when I worked with his daughter, Julie, as teenagers, on the 1972 McGovern presidential campaign. Since that time, and until recently, Julie Larson has been one of my closest friends, and Allan Larson has been like a second father to me, and like a grandfather to my children. Julie Larson and I, together with our children, frequently took vacations together, and my children and her children considered each other to be like cousins. As far back as my high school years, the Larsons took me on family vacations to Cape Cod, and I stayed at their Cape Cod house on multiple occasions during my college years. Mr. Larson repeatedly confided to me about personal matters, including those involving his family. Out of respect for him, I will not repeat them here. We spoke on a regular basis, and he helped me write my father's eulogy when my father died in October 2001. Mr. Larson referred to my children as his grandchildren, and, when he called me, would ask "How are my grandchildren?" He knew all about their athletic events, performance, etc. He insisted that my son attend the opening of Tick Tick Boom, a musical that Mr. Larson's son had written, even though it was the night before my son's Earth Science Regents examination, because it was a "family" commitment.

      5.    Mr. Larson was middle-class until his son died in 1996, shortly before the musical Rent, which his son wrote, premiered on Broadway and became a smash hit worldwide. As a result, Mr. Larson became, on information and belief, at least a deca-millionaire. Mr. Larson took me to London and Milan for premieres of Rent, and my family were the only

DSMDB-2459689

personal guests of the Larsons at the director's screening of the movie Rent. Indeed, Julie

Larson often referred to me as "Al's east coast daughter."

6.      I was not the only one who benefited from Mr. Larson's generosity. On many

occasions, Julie Larson bragged that her parents gave away substantial sums and supported other

people. Ms. Guzman, in contrast, criticized Mr. Larson to me repeatedly for giving away so

much money, and said that she wanted to be the gatekeeper for all of Mr. Larson's business

affairs such that all people having financial dealings with Mr. Larson, would have to go through

her rather than dealing directly with Mr. Larson. She told me the Larsons were "A-list bread and

butter" clients of hers.

7.      In contrast to Mr. Larson, my financial situation has been difficult since my

husband and I separated in 1996. Although I am a real estate attorney in Larchmont, New York,

my income has never exceeded five figures, in large part because I have been in sole practice for

several years, and have spent substantial time parenting my two children with no help from their

father. Things are only worse now because of current real estate market conditions. As set forth

below, I have not received child support from their father. In fact, I cannot afford the cost of

representing myself in this action, and the only reason that I can defend myself is that I am being

represented my brother's law firm without charge. My sole asset of any significance is my

house.

8.      The first time that Mr. Larson offered me money was in August 1997. We

were attending the party after the opening of Rent in Washington, D.C., and Mr. Larson asked if

I needed any money. I said no. He then said that if I ever needed money to call him.

9.      Mr. Larson frequently offered me money without my request. I never took

money from him without him offering the money first. One time he told me he wanted me to get

the computer program Quicken to make it easier for me to track my expenses in connection with

DSMDB-2459689

my divorce. He offered to pay for the program. I purchased it for $39.99, but Mr. Larson sent me a check for $1,000. I asked him why he sent me $1,000 for a $39.99 item, and he said that I should be like his other children and not give him back his change. Another time Mr. Larson actually offered to buy my house for me.

10.     Another example of a gift concerned my son Alex's bar mitzvah. After the bar mitzvah, Mr. Larson, who had attended it, telephoned me and stated that he was extremely proud of Alex and me, and happy that his grandson, Matthew, had participated in the ceremony. He then sent me a gift of $10,000 to pay for the costs of the bar mitzvah.

11.     Another significant gift that Mr. Larson made to me was in August 2002, four months after I lost my job at a law firm. Mr. Larson knew that I was short of money, and busy job hunting and working with him on the financial settlement of my divorce. He telephoned me, and sent me a gift of $6,500 to help me make ends meet.

12.     By far the most significant of Mr. Larson's gifts concerned the resolution of my divorce from my ex-husband, John. Although the marriage had legally ended, we were still in intense negotiations concerning child support, interest in real estate, and so forth. Mr. Larson expressed concern about the length of time it took to resolve the divorce, and its effect on my family. He wanted me to hire a new attorney, and said he would pay for the costs. He paid the new lawyer directly. Mr. Larson has long maintained an apartment in New York. He was a full participant in the divorce proceedings: he even reviewed and participated in drafting all of the relevant court papers. At the time, as Mr. Larson knew, I was unemployed and contemplating starting my own law firm, which he supported.

13.     The day that we reached settlement with my ex-husband, September 24, 2002, Mr. Larson was present in the courtroom and actively participated in the negotiations. He graciously, and without prompting from me, offered me money to "make" the deal. This offer

DSMDB-2459689

resolved the divorce proceedings.  Pursuant to the terms of the deal that I struck with my ex-husband, I waived all child support and paid my ex-husband a lump sum in order to keep our house so that my children could grow up in the community.  Mr. Larson offered to pay my ex-husband a lump sum of $81,000, to pay down the existing mortgages in both mine and my ex-husband's name that were encumbering my house, and to advance funds to restore the house, which was in disrepair.  Mr. Larson was fully aware of my financial situation and knew that I had no money to repay any amounts that were given to me as an unemployed single mother without child support.  I certainly would not have waived child support, or agreed to pay my ex-husband a lump sum of money, since I did not have these funds, had Mr. Larson not made this offer.  Moreover, Mr. Larson's offer to pay down the mortgages enabled me to accept onerous settlement provisions that I would not have been able to accept without Mr. Larson's offer.

14.     At the time that Mr. Larson offered to make these advances, and I agreed consequently to resolve the claims against my ex-husband, Mr. Larson and I did not discuss that any of the money was to be repaid, and I had no understanding that any sums were to be repaid by me because of his prior gifts to me, our relationship and his prior offer to buy my house for me.  We later agreed, however, that whatever sums, if any, would be repaid by me for advances that he made, would be secured by a mortgage on my house, since that was my only asset.  We never discussed any specific terms for repayment.  Mr. Larson knew that I could not repay funds, particularly since I had waived child support.

15.     Mr. Larson made the payments that he had agreed to make during the divorce negotiations in four advances.  On one occasion, in October 2002, he wired me $100,000.  Because the amount then due to my ex-husband was only $81,000, I asked Mr. Larson why he sent me $100,000.  His response was that he hated odd numbers and knew that I could use the

DSMDB-2459689

extra money.  He subsequently wired me $120,000 in April 2003 to pay off my mortgages and

ancillary expenses, and sent me $35,000 in the Fall of 2003 to help restore my home.

     16.    After speaking with his business manager, Mr. Larson requested that I draft

papers with respect to some of the funds that he previously agreed during the divorce

proceedings to advance to me, to have a "paper" trail for the IRS.  The documents that I drafted

in January 2003, just as I started my own law firm, were attached to the Complaint as Exhibits 1-

3.[1]  Tellingly, the Complaint attaches my cover letter that attached these documents as Exhibit

14.  That cover letter, dated January 16, 2003, notes that it is a draft, and requested that Ms.

Guzman discuss the transaction with me.  I did not sign any of the attached documents.

Although the Complaint seems to rely upon these notes to argue that an agreement was reached

in January 2003, I never signed any of the documents, indicated that they were drafts, and Mr.

Larson did not agree to the terms in the documents, and instead later offered different terms in

response.  Indeed, the Complaint admits that these documents were not executed "as the parties

were not able to reach agreement."  *See* Complaint ¶ 6.  Ms. Guzman's office rejected my

submission in July 2003 (*see* Exhibit 2) and in 2004 later submitted proposals with different

amounts and interest rates than in the drafts that I sent in January 2003.  We did not engage in

further settlement negotiations until February 2007.

     17.    Settlement negotiations resumed in earnest in 2007.  On February 13, 2007,

Ms. Guzman sent me a proposed mortgage, note, promissory note, and "initialization

information."  *See* Exhibit 3.  Both sides knew that any funds that I would repay Mr. Larson

would come from a mortgage on my property, with Mr. Larson as the mortgagee, since I had no

other assets.  Indeed, at Ms. Guzman's request, I sent her a statement of my net worth on

June 27, 2007, which revealed that the only asset that I owned that exceeded $6,000 was my

---

[1] My attorneys obtained the exhibits from this Court's files.

DSMDB-2459689

house. *See* Exhibit 4. In that statement I inadvertently failed to include an IRA obtained while working for a former employer worth about $40,000 and credit card debt which is currently in excess of $15,000. As late as June 7, 2007, however, Ms. Guzman recognized that neither side had anything in writing regarding their understandings of the funds that were going to be transferred. *See* Exhibit 5.

18.    On October 9, 2007, Ms. Guzman advised me that she was trying to compose a settlement offer that would minimize tax consequences to Mr. Larson. No mention was made of imposing tax consequences on me. As set forth in her proposal, I would pay $150,000 in five years, secured by a mortgage note and deed on my residence, with no monthly payments or interest from me. *See* Exhibit 6. I agreed to the $150,000 payment but could not agree to make that payment in five years.

19.    Settlement negotiations continued. Ms. Guzman and I had numerous discussions. On November 20, she stated that "you and I have covered all the issues at this point and as I stated to you yesterday, there is an urgency to wrapping up these negotiations." *See* Exhibit 7.

20.    In response to Ms. Guzman's offer of October 9, I proposed a longer period of repayment, but offered to make monthly interest payments.

21.    We finally reached agreement in late November or early December 2007. I agreed to repay Mr. Larson $150,000 in 15 years or upon my death or sale of the property, with interest payments of $50 per month. Ms. Guzman's e-mail to me of December 7, 2007, Exhibit 8, confirmed our agreement to these terms, although she left out the principal amount, since we already had agreed to the $150,000 amount. With respect to the terms of our agreement, Ms. Guzman emphasized that "[t]here is nothing to discuss regarding these terms." She requested

DSMDB-2459689

that I send a revised mortgage deed and note to reflect the amounts. I sent her the relevant documents on December 11, 2007. *See* Exhibit 9.

22.   I repeatedly contacted Ms. Guzman over the next several months in an attempt to determine the status of the documents that I sent to her. Weeks after our agreement was reached, Ms. Guzman raised vague issues concerning the tax consequences of the documents that I had sent her on December 11. *See* Exhibit 10. I immediately responded that I disagreed with her comments about past events, *see* Exhibit 11, since we already had reached a deal. Finally, on May 12, 2008, I sent Ms. Guzman an e-mail stating that it was more than five months since the parties had reached settlement in order to avoid litigation based on the following terms: $150,000 principal, $50 per month interest only payments, principal due in 15 years or upon sale of the property. *See* Exhibit 12.

23.   Finally, on May 14, 2008, Ms. Guzman responded in an e-mail, advising me that she had sent by Federal Express a settlement agreement to me. She added that "the terms are the same." *See* Exhibit 13.

24.   The final communication from Ms. Guzman was the May 14, 2008 letter, which included a copy of the Complaint, without exhibits. *See* Exhibit 1. In pertinent part, Ms. Guzman stated that "I have maintained the settlement terms that you and I had agreed to in December 2007." She added that "This note will bear the new terms discussed and agreed upon by the two of us." She also agreed to the form of note and mortgage that I had submitted on December 11, 2007:

25.   Unfortunately, however, Ms. Guzman's letter characterized past events and terms that we had not agreed to. For example, she stated that "the $80,000 note has been forgiven in it's [sic] entirety and Mr. Larson will accept the tax consequences from this action." This apparently refers to the $81,000 gift that he funded to resolve my divorce with my ex-

DSMDB-2459689

husband, which was never intended to be a "note." She also stated that "to date, we have not been provided with any proof of your inability to pay," despite my prior submission of my financial net worth. *See* Exhibit 4.

26.     More importantly, Ms. Guzman threatened suit unless I agreed to additional terms that had never been discussed: the $80,000 was to be a "forgiven" non-business bad debt; an additional $20,000 was a "non-business bad debt" that was forgiven, and I was to enter into a consent judgment for more than $300,000, all of which had no basis, and would likely result in tax and other potential consequences to me that I never agreed to and could not afford.

27.     Notwithstanding the fact that Ms. Guzman repeatedly advised me not to involve attorneys in our negotiations, on the grounds that this would likely result in litigation, her letter of May 14 attached a Complaint that apparently already had been filed against me.

Jaine Elkind Eney

Sworn to before me this 14th day of
August , 2008.

Notary Public

BARBARA BOYCE
Notary Public, State of New York
No. 01BO6018270
Appointed in Westchester County
Commission Expires Jan. 11, 2011

DSMDB-2459689

# EXHIBIT  1



**Guzman & Lou, LLP**
ATTORNEYS AT LAW

May 14, 2008                                    **Via Federal Express**

Jaine Eney
9 Kilmer Road
Larchmont, NY 10538

           Re:    *Larson/Eney Settlement Agreement*
           *Our File No: B224.13.2*

Dear Jaine,

As you know we engaged tax attorneys to review the Settlement Agreement prepared by your tax attorney. Unfortunately, they differ greatly with how the settlement needs to be structured for tax purposes. I have maintained the settlement terms that you and I had agreed to in December of 2007, however, we have greatly altered the structure of the proposed settlement agreement submitted by your tax counsel. Enclosed you will find our proposed Settlement Agreement.

We have based the structure of our proposed settlement agreement on the research completed by our tax attorneys. According to their research, whether a dispute is resolved through litigation or settlement, the nature of the underlying action determines the proper tax consequences of the payment. Getty v. Commissioner, 913 F.2d 1486 (9th Cir. 1990), revg. 91 T.C. 160 (1988); Tribune Publishing Co. v. United States, 836 F.2d 1176, 1177 (9th Cir. 1988). The taxability of a settlement is controlled by the nature of the litigation. Raytheon Production Corp. v. Commissioner, 144 F.2d 110, 114 (1st Cir. 1944), affg. 1 T.C. 952 (1943); Victor E. Gidwitz Family Trust v. Commissioner, 61 T.C. 664, 673 (1974). The nature of the litigation is, in turn, controlled by the origin and character of the claim which gave rise to the litigation. United States v. Gilmore, 372 U.S. 39 (1963); Victor E. Gidwitz Family Trust v. Commissioner, supra.

Therefore, we need to look to the factual situation in each instance that money was transferred to you and any evidence by either party of the intent behind the transfers. We cannot randomly consider some transactions as gifts and others as loans for purposes of settlement without the factual support required to prove they warrant these classifications. If the IRS were ever to audit either you or Al, they would reconstruct the transactions by reviewing all correspondence and documents related to each incident. It is our tax

attorney's opinion that out of all the money transferred to you, the two notes that you sent in January of 2003 would most likely be the starting point of their reconstruction of the events and thus was the starting point for the structure of our settlement.

The facts as have been related to me by you and Al are the basis of the Recitals. Our settlement offer is in the form of the two notes that you provided this office in January of 2003. The $80,000 note has been forgiven in it's entirety and Mr. Larson will accept the tax consequences resulting from this action. You will note that we are agreeing not to report this forgiveness as a personal bad debt and we see no reporting requirement involved in issuing you a 1099 for the amount forgiven.

The $170,000 note has been reduced to $150,000. This note will bear the new terms discussed and agreed upon by the two of us. Again, Mr. Larson will accept the tax consequences for the difference of the stated interest rate and the Applicable Federal Rate that will be imputed to him each year. We will accept the proposed forms for the mortgage and note as submitted by you on December 7, 2007. Our references to Exhibit "A" and "B" are to those notes.

In reconstructing the $170,000 note it was clear that you had encompassed the $31,610 from the previous year, the anticipated $120,000 and the $20,000 in 2003 and simply rounded down the number. The remaining balances are treated as gifts and the factual scenario surrounding each transfer can clearly support these classifications. You will note that Mr. Larson will have tax consequences for all gifts over $10,000 in any given year and accepts those treatments.

It is only fair that each party accepts their own tax consequences and we have proposed such a term in the settlement agreement. I had previously explained to you that paragraph 4 of the settlement agreement proposed by your attorney was simply not acceptable. In the spirit of settlement each party should accept responsibility for any future tax consequence they each may have as a result of this settlement.

To date, we have not been provided any proof of your inability to pay. We have accepted up until this point your verbal statements as to your dire financial state. However, for purposes of IRS requirements and as a condition of Mr. Larson agreeing to compromise on the amount that he believes he is owed and the reduced interest rate, we will require that proof be provided as defined in the settlement agreement.

We have engaged New York counsel to review our proposed Settlement Agreement and to finalize this matter with you. You can contact either Mr. Robert Powley and/or Mr. James Gibson of Powley & Gibson, P.C. Their contact information is as follows:

Powley & Gibson, P.C.
304 Hudson Street, 2nd Floor
New York, NY 10013
Ph: 212-226-5054  Fax: 212-226-5085

This offer shall remain open until May 30, 2008. All future communication needs to be addressed to either Mr. Powley or Mr. Gibson. They will keep me apprised of the status of this case. I again ask that you do not directly communicate with Al, Nan, or Julie Larson regarding this matter.

In light of the length of time that this matter has gone unresolved, we have prepared and filed a lawsuit in this matter in the state of New York. Please note that we do not intend to effectuate service on the Complaint unless the Settlement Agreement is not approved and executed by you on or before May 30, 2008. I have enclosed a courtesy copy of the complaint sans Exhibits. I strongly urge you to contact Mr. Powley or Mr. Gibson as to your intent to go forward with the Settlement.

Very truly yours,

Denise M. Guzman

Enclosures

cc: Al Larson
    Robert Powley
    James Gibson

## SETTLEMENT AGREEMENT AND RELEASE

**1.0.**   **PARTIES.**   The parties to this Settlement Agreement and Release ("Agreement") are, JAINE ELKIND ENEY residing at 9 Kilmer Road, Larchmont, New York, 10538, (hereinafter "ENEY") and ALLAN S. LARSON residing at 2160 Century Part East, Apt #1702, Century City, California 90067 (hereinafter "LARSON") (ENEY and LARSON hereinafter referred to collectively as "the PARTIES").

**2.0.**   **RECITALS.**  This Agreement is based on the facts set forth below:

2.1.   WHEREAS on May 26, 2000 LARSON transferred directly to ENEY the sum of $ 10,000;

2.2.   WHEREAS in the year 2002 the following sums were transferred directly to ENEY or on her behalf on the stated dates:

    2.2.1.   August 5, 2002      $   6,500
    2.2.2.   October 8,2002     $ 100,000
    2.2.3.   October 29,2002    $  10,000
    2.2.4.   November 10,2002   $  10,000
    2.2.5.   November 10,2002   $   5,110.80;

2.3.   WHEREAS in the year 2003 the following sums were transferred directly to ENEY on the stated dates:
    2.3.1.   April 14, 2003      $ 120,000
    2.3.2.   September 3,2003   $  15,000
    2.3.3.   October 12, 2003    $  20,000;

2.4.   WHEREAS ENEY contends that the $10,000 transferred to her from LARSON on May 26, 2000 was directed to her by LARSON as a gift for her son's Bar Mitzvah;

2.5.   WHEREAS LARSON contends that on October 8, 2002 that he transferred to ENEY $100,000 for the purpose of providing ENEY with the means to buy-out her ex-husband's one-half interest in the family residence as a term of ENEY's divorce settlement and to pay for certain repairs to ENEY's residence;

2.6.   WHEREAS LARSON further contends that it was his intent to be paid back in full for the money transferred to ENEY in 2002;

2.7.   WHEREAS ENEY contends that the buy-out of her ex-husband's one-half interest in the family residence was $81,000 and the $81,000 was the number she conveyed to LARSON.   ENEY contends that the difference of the $81,000 and $100,000 received by her on October 8, 2002 was intended as a gift by LARSON;

1

2.8.    WHEREAS in addition, in 2002 LARSON transferred directly to ENEY the sum of $6,500 on the date stated above;

2.9.    WHEREAS in 2002 LARSON transferred the additional sums of $25,110.80 to third party creditors of ENEY on her behalf;

2.10.   WHEREAS ENEY further contends that at the time she received money from LARSON in 2002 she was uncertain as to how much of the money that was given to her would have to be paid back to LARSON;

2.11.   WHEREAS ENEY on January 16, 2003 prepared and delivered to LARSON an unsecured Promissory Note in the amount of $80,000 with interest at 4.45%, monthly payments to be interest only for a period of thirty (30) years with a balloon payment of principal at the end of thirty (30) years.  The Note was unexecuted by ENEY and delivered to LARSON for his review;

2.12.   WHEREAS on January 16, 2003 ENEY prepared and delivered to LARSON a Promissory Note in the amount of $170,000 to be secured by a mortgage on ENEY's residence. The terms of this note were for thirty (30) years, fully amortized with stated monthly payments of $856.32.  The note was prepared in anticipation of additional sums to be transferred to ENEY from LARSON in 2003 and included previous sums transferred to ENEY in 2002.  The Note was unexecuted by ENEY and delivered to LARSON for his review;

2.13.   WHEREAS ENEY and LARSON discussed that LARSON would transfer to ENEY $120,000 for the sole purpose of ENEY paying-off the mortgage on her residence;

2.14.   WHEREAS LARSON alleges that it was his intent to loan ENEY the money to pay off her mortgage at a lower interest than what she was then paying and to secure a first position as a lien holder on her residence;

2.15.   WHEREAS LARSON on April 14, 2003 transferred to ENEY the sum of $ 120,000.  In addition the sums of $15,000 and $20,000 were transferred directly to ENEY on the dates stated above;

2.16.   WHEREAS ENEY further contends that at the time she received money from LARSON in 2003 she was uncertain as to how much of the money that was given to her would have to be paid back to LARSON;

2.17.   WHEREAS ENEY contends that she is unable to make payments under the terms of the above stated Notes of $80,000 and $170,000;

2

2.18.   WHEREAS ENEY further contends that she has no other assets, real or personal, that is held for her benefit by any third party, including but not limited to any family members;

2.19.   WHEREAS ENEY represents that she is the sole owner of 9 Kilmer Road in Larchmont, New York;

2.20.   WHEREAS LARSON filed a complaint against ENEY for breach of contract, unjust enrichment, fraud, conversion, and breach of implied covenant of good faith and fair dealing in the federal district court for the Southern District of New York and the PARTIES are entering this agreement in an effort to settle the allegations therein.

In consideration of the foregoing and of the mutual representations and covenants contained herein, the PARTIES hereto agree as follows:

**3.0    AGREEMENT.**

3.1   FORGIVENESS OF $80,000 UNSECURED NOTE.    LARSON hereby agrees to forgive in full, the $80,000 Unsecured Note as presented by ENEY dated January 2003. The parties agree that this note under IRC Regs 166(d)(2) constitutes a nonbusiness bad debt. However, the parties agree that LARSON will not claim for tax purposes this Note as a bad debt on his personal tax return.

3.2   COMPROMISE OF $170,000 SECURED NOTE.

3.2.1   LARSON agrees to reduce the $ 170,000 Secured Note to $150,000. LARSON agrees that the difference of the amount of money owed on this Note and the compromised amount of $150,000 constituting a non-business bad debt under Internal Revenue Code § 166(d)(2) and Treasury Regulations, Subchapter A, § 1.66-1 and will not be claimed for tax purposes as bad debt on LARSON's personal tax return.

3.2.2   ENEY agrees to execute a Secured Promissory Note, in the form attached hereto as Exhibit "A" in the amount of $150,000 secured by a mortgage, in the form attached hereto as Exhibit "B", on her residence at 9 Kilmer Road, Larchmont, New York, 10538. The Note will carry interest at .4% on the principal, monthly payments of $50 will be made on the first day of each month, the first payment due on the execution of this Agreement. The entire note of principal and interest shall be due 15 years from January 1, 2008 or due in full at the death of ENEY or if the residence is sold. The mortgage shall be in first position of all other liens or encumbrances on the residence. LARSON shall have the right to fully assign said Note.

3

3.3    GIFTS. The PARTIES agree that the following transfers to ENEY were intended as gifts to ENEY:
3.3.1    $10,000 transferred to ENEY on May 26, 2000;
3.3.2    $19,000 transferred to ENEY on October 8, 2002
3.3.3    $15,000 transferred to ENEY on September 3, 2003

3.4    ASSUMPTION OF FUTURE TAX CONSEQUENCES.    Both PARTIES agree to be responsible for their own tax liability on any future tax consequences that either party may incur as a result of this Settlement Agreement and Release.

3.5    PROOF OF INABILITY TO REPAY. ENEY shall produce a verified balance sheet and an affidavit from her tax preparer as to her net worth regarding her personal and real property assets as way of proof of her inability to repay the total amount of the Notes as stated in Paragraphs 3.1 and 3.2 above.

3.6    CONSENT JUDGMENT. This Settlement and Release Agreement shall be secured by a Consent Judgment signed by the PARTIES, by which ENEY stipulates to allow LARSON to have a Judgment entered against ENEY in the sum of $311,357.47 which represents the total amount of interest and principal owed on the $80,000 and the $170,000 notes as of January 1, 2008. The Judgment would be held by LARSON as security for the payments as set forth in paragraph 3.2 above and not filed with the Court, provided that ENEY make all of the payments outlined in paragraph 3.2. The Consent Judgment shall not be filed unless there was a default by ENEY in making the required payments as set forth in paragraph 3.2. If ENEY defaults in the payment schedule, LARSON must provide ENEY with seven (7) days written notice of default and ENEY would have seven (7) days to cure the default. To be effective, written notice must be sent by an overnight courier selected by LARSON, or notice by personal service whichever LARSON chooses as an effective method of notice. Notice will be deemed given to ENEY upon personal service or deposit of the notice with an overnight courier. Provided ENEY makes payments in accordance with paragraph 3.2 above, or cures the default within seven (7) days of receipt of any written default notice, then the original Consent Judgment would not be filed with the Court, and would be returned to ENEY's attorney within seven (7) days of receipt of final payment in accordance with paragraph 3.2 above.

3.7    RELEASES. Except as to such rights or claims as may be created by this Agreement, each party hereby releases, remits and forever discharges each other party hereto from any and all claims, demands and causes of action arising out of, connected with, or incidental to the dealings between the PARTIES, including but not limited to LARSON's claim for the Loans or any other money owed

4

by ENEY to LARSON. The PARTIES are aware that they may hereafter discover claims or facts in addition to or different from those it now know or believes to be true with respect to the matters related herein. Nevertheless, it is the intention of the PARTIES to fully, finally and forever settle, and release all such matters, and all claims relative thereto, which do now exist, may exist, or should therefore have existed between them, except as to such claims as may be created by this Agreement. In furtherance of such intention, the releases given herein shall be and remain in effect as full and complete mutual releases of all such matters, notwithstanding the discovery or existence of any additional or different claims or facts relative thereto.

3.8    <u>Additional Documents</u>. The PARTIES shall execute all such further and additional documents as shall be reasonable, convenient, necessary or desirable to carry out the provisions of this Settlement Agreement.

## 4.0.    <u>REPRESENTATIONS AND WARRANTIES</u>.    Each party hereto represents, warrants, and agrees as follows:

4.1.    <u>Legal Advice</u>. The PARTIES each had the opportunity to seek independent legal advice from an attorney of his own choosing with respect to the advisability of making the Agreement provided herein, with respect to the advisability of executing this Agreement and with respect to the meaning and operation of California Civil Code Section 1542, wherever applicable to either or both PARTIES hereto.

4.2.    <u>Legal Representation.</u> The PARTIES hereto acknowledge that the preparers of this Agreement are Denise M. Guzman, of Guzman & Lou, LLP, attorney for LARSON, and Lee Corbin of Kurzman Eisenberg Corbin Lever & Goodman, LLP, attorney for ENEY.

4.3.    <u>No Reliance.</u> No party nor any agent, representative, or attorney of any party has made any statement or representation to any of the parties regarding any fact relied upon in entering into this Agreement, and each party does not rely upon any statement, representation or promise of any party or of any officer, agent, employee, representative or attorney for the other party, in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement.

4.4.    <u>No Assignment</u>. None of the parties herein assigned, transferred, granted, or purported to assign, transfer or grant, any of the claims, demands and the causes of action disposed of by this Agreement.

5

4.5     <u>Authority.</u>   The PARTIES represent that they have the legal capacity and authority to enter into this Agreement and do so under their own free will.

**5.0.    <u>MISCELLANEOUS</u>.**

5.1     <u>Applicable Law and Venue</u>.   This Agreement shall be deemed to have been executed and delivered within the State of New York, and the rights and obligations of the parties hereto shall be construed and enforced in accordance with, and governed by, the laws of the State of New York.

5.2.    <u>Entire Agreement</u>.   This Agreement is the entire Agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral or written agreements. This Agreement may be amended only by an agreement in writing.

5.4.    <u>Successors in Interest</u>.   This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective agents, representatives, assigns, heirs, and successors in interest.

5.5.    <u>Drafting Responsibility</u>.   Each party has participated in the drafting and preparation of this Agreement.  Hence in any construction to be made of this Agreement, the same shall not be construed against any party.

5.6.    <u>Costs and Attorneys Fees</u>.   In the event of any dispute with respect to the terms of this Agreement, the prevailing party shall be entitled to all of its costs and attorneys fees in resolving the dispute (including arbitration fees).

5.7.    <u>Counterparts</u>.   This Agreement may be executed in counter-parts, all of which shall be an original for all purposes.

6

5.8.   <u>Effective Date</u>.  This Agreement is effective as of the date on which the final party to this Agreement herein signs.

**PARTIES**

_____          _____
JAINE ELKIND ENEY                                               DATE


_____          _____
ALLAN S. LARSON                                                 DATE


**\*APPROVED AS TO FORM AND CONTENT**

_____          _____
DENISE M. GUZMAN                                          DATE
Attorney for LARSON


_____          _____
LEE CORBIN                                                      DATE
Attorney for ENEY

7

JS 44C/SDNY
REV. 12/2005

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Allan S. Larson | Jaine Elkind Eney |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Powley&Gibson, P.C., 304 Hudson Street, 2nd Fl. NY, NY 10013,212-226-5054 | Unknown |

APR 1 0 2008

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

Breach of Implied Contract, Unjust Enrichment, Fraud, Conversion and Breach of Implied Covenant of Good Faith and Fair Dealing

Has this or a similar case been previously filed in SDNY at any time? No[X] Yes?[ ]    Judge Previously Assigned

If yes, was this case Vol.[ ] Invol.[ ] Dismissed. No[ ] Yes [ ]    If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*    NATURE OF SUIT

### ACTIONS UNDER STATUTES

#### TORTS

**CONTRACT**
[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[x] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**
[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**
[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

#### ACTIONS UNDER STATUTES

**REAL PROPERTY**
[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**CIVIL RIGHTS**
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

**FORFEITURE/PENALTY**
[ ] 610 AGRICULTURE
[ ] 620 FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**
[ ] 861 HIA (1395FF)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC (405(g))
[ ] 863 DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES
[ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE/ICC RATES/ETC
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 891 AGRICULTURE ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES
[ ] 890 OTHER STATUTORY ACTIONS

*Check if demanded in complaint:*

CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

DEMAND $_____  OTHER _____    JUDGE _____    DOCKET NUMBER_____

*Check YES only if demanded in complaint*
JURY DEMAND: [X] YES [ ] NO    NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

(SEE REVERSE)

**(PLACE AN x IN ONE BOX ONLY)**            **ORIGIN**

[x] 1 Original Proceeding   [ ] 2a. Removed from State Court   [ ] 3 Remanded from Appellate Court   [ ] 4 Reinstated or Reopened   [ ] 5 Transferred from (Specify District)   [ ] 6 Multidistrict Litigation   [ ] 7 Appeal to District Judge from Magistrate Judge Judgment

[ ] 2b Removed from State Court AND at least one party is a pro se litigant

**(PLACE AN x IN ONE BOX ONLY)**    **BASIS OF JURISDICTION**    **IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1332, 1441)**

[ ] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)   [x] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] box for Plaintiff and one box for Defendant)

| | PTF DEF | | PTF DEF | | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 [x]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 [ ]5 |
| CITIZEN OF ANOTHER STATE | [x]2 [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 [ ]4 | FOREIGN NATION | [ ]6 [ ]6 |

**PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)**

Allan S. Larson
13603 Marina Pointe Drive
Marina del Rey, California 90292
Los Angeles County

**DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)**

Jaine Elkind Eney
9 Kilmer Road
Larchmont, New York 10538
Westchester County

**DEFENDANT(S) ADDRESS UNKNOWN**
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION.)

DATE    SIGNATURE OF ATTORNEY OF RECORD    ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
RECEIPT #    [x] YES (DATE ADMITTED Mo. March Yr. 2000)
Attorney Bar Code # DL 3072

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ MAAS _____ Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____ Southern _____ District of _____ New York _____

Allan S. Larson

**SUMMONS IN A CIVIL ACTION**

V.

Jaine Elkind Eney

CASE NUMBER:

# 08 CV 03513

TO: (Name and address of Defendant)

Jaine Elkind Eney
9 Kilmer Road
Larchmont, New York 10538

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Robert L. Powley
James M. Gibson
David J. Lorenz
Powley & Gibson, P.C.
304 Hudson Street, 2nd Floor
New York, New York 10013

an answer to the complaint which is served on you with this summons, within _____ twenty (20) _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

# J. MICHAEL McMAHON

APR 1 0 2008

CLERK

DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
           Date                      *Signature of Server*

                                    _____
                                      *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

Robert L. Powley (RP 7674)
James M. Gibson (JG 9234)
David J. Lorenz (DL 3072)
Powley & Gibson, P.C.
304 Hudson Street, 2nd Floor
New York, New York 10013
Telephone: (212) 226-5054
Facsimile: (212) 226-5085

Attorneys for Plaintiff
Allan S. Larson

**08 CV 03513**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED
U.S.D.C. S.D N.Y.
CASHIERS

– – – – – – – – – – – – – – – – – – – – – – – – x

ALLAN S. LARSON                          :

        Plaintiff,                    :      **CASE NO.**

    v.                                    :      **COMPLAINT FOR BREACH OF**
                                   **CONTRACT, UNJUST**
                             :      **ENRICHMENT, FRAUD,**
JAINE ELKIND ENEY                        :      **CONVERSION AND BREACH OF**
                             :      **IMPLIED COVENANT OF GOOD**
        Defendant.                    :      **FAITH AND FAIR DEALING**
                             :
                             :      **ECF**
                             :

– – – – – – – – – – – – – – – – – – – – – – – – x

      Plaintiff Allan S. Larson (hereinafter referred to as "Plaintiff") by his attorneys

complains of defendant Jaine Elkind Eney (hereinafter referred to as "Defendant") and alleges

as follows:

<u>THE PARTIES</u>

1.     Plaintiff is a citizen of the State of California with an address at 13603 Marina Pointe

Drive, Marina del Rey, California 90292.

2.     On information and belief, Defendant is a citizen of the State of New York with an address at 9 Kilmer Road, Larchmont, New York 10538.

## JURISDICTION AND VENUE

3.     The court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1). Diversity of citizenship is present between Plaintiff and Defendant. The matter in controversy exceeds $75,000 in value, exclusive of interest and costs.

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2). Property at issue in this action is located within this district, a substantial part of the events giving rise to Plaintiff's claims against Defendant occurred in this district and, upon information and belief, a substantial portion of the money Plaintiff seeks from Defendant was used to satisfy a mortgage owing on Defendant's property, to pay for legal services and to pay living expenses, all of which took place in this district.

## NATURE OF THE CASE

5.     This action arises out of Defendant's failure to repay funds loaned to Defendant by Plaintiff. On several occasions, Plaintiff made loans to Defendant totaling $296,610.80 ("the Subject Loans"). On information and belief, Defendant used the monies from the Subject Loans for the purpose of satisfying mortgage obligations and other interests applicable to Defendant's residence, as well as paying for legal services received by Defendant and for general living expenses.

6.     Prior to the Subject Loans being made, Defendant orally agreed to repay the Subject Loans with interest. The parties' intent that the Subject Loans would be repaid to Plaintiff is clearly manifested by certain writings, including a Mortgage, Mortgage Note and Note dated January 2003 that were prepared by Defendant and sent to Plaintiff. The Mortgage,

Mortgage Note and Note dated January 2003 were not executed as the parties were not able

to reach agreement upon an interest rate for repayment. True and correct copies of the

January 2003 Mortgage, January 2003 Mortgage Note and January 2003 Note are attached as

Exhibits 1, 2 and 3, respectively.

7.     To date, Defendant has not repaid any of the Subject Loans despite repeated requests

from Plaintiff do so.

BACKGROUND FACTS

The Subject Loans

8.     On or about May 26, 2000, Plaintiff sent to Defendant a loan in the amount of

$10,000.00 by check bearing serial number 1114. Plaintiff marked said check as "loan" in

the memo section. A true and correct copy of the check bearing serial number 1114 is

attached as Exhibit 4.

9.     On or about August 5, 2002, Plaintiff sent to Defendant a loan in the amount of

$6,500.00 by check bearing serial number 1661. Plaintiff marked said check as "loan" in the

memo section. A true and correct copy of the check bearing serial number 1661 is attached

as Exhibit 5.

10.     On or about October 8, 2002, Plaintiff sent to Defendant a loan in the amount of

$100,000.00 by wire transfer. A true and correct copy of Plaintiff's bank statement showing

the October 8, 2002 wire transfer is attached as Exhibit 6.

11.     On or about October 29, 2002, Plaintiff made a loan to Defendant in the amount of

$10,000.00 by check bearing serial number 1519. At Defendant's request and pursuant to the

parties' agreement, Plaintiff made this check payable to Richard Danzig, Esq. on Defendant's

behalf. Upon information and belief, said loan was used for Defendant's benefit to pay for

3

legal services rendered to Defendant. A true and correct copy of the check bearing serial

number 1519 is attached as Exhibit 7.

12.     On or about November 10, 2002, Plaintiff made a loan to Defendant in the amount of

$10,000.00 by check bearing serial number 1531. At Defendant's request and pursuant to the

parties' agreement, Plaintiff made this check payable to Kurzman Eisenberg Corbin & Lever,

LLP on Defendant's behalf. Upon information and belief, said loan was used for

Defendant's benefit to pay for legal services rendered to Defendant. A true and correct copy

of the check bearing serial number 1531 is attached as Exhibit 8.

13.     On or about November 10, 2002, Plaintiff made a loan to Defendant in the amount of

$5,110.80 by check bearing serial number 1532. At Defendant's request and pursuant to the

parties' agreement, Plaintiff made this check payable to Richard Danzig, Esq. on Defendant's

behalf. Upon information and belief, said loan was used for Defendant's benefit to pay for

legal services rendered to Defendant. A true and correct copy of the check bearing serial

number 1532 is attached as Exhibit 9.

14.     On or about April 14, 2003, Plaintiff sent to Defendant a loan in the amount of

$120,000.00 by wire transfer. A true and correct copy of Plaintiff's bank statement showing

the April 14, 2003 wire transfer is attached as Exhibit 10.

15.     On or about September 3, 2003, Plaintiff sent to Defendant a loan in the amount of

$15,000.00 by check bearing serial number 1909. Plaintiff marked said check as "loan" in

the memo section. A true and correct copy of the check bearing serial number 1909 is

attached as Exhibit 11.

16.     On or about October 12, 2003, Plaintiff sent to Defendant a loan in the amount of

$20,000.00 by check bearing serial number 1927. Plaintiff marked said check as "loan" in

the memo section.  A true and correct copy of the check bearing serial number 1927 is attached as Exhibit 12.

17.    The foregoing loans sent to Defendant, totaling $296,610.80, constitute the principal of the Subject Loans from Plaintiff to Defendant.

The Parties' Agreement

18.    On information and belief, on or before May 26, 2000, Plaintiff orally agreed to provide the Subject Loans to Defendant, with the purpose of enabling Defendant to satisfy an existing bank mortgage owing on Defendant's residence located at 9 Kilmer Road, Larchmont, New York 10538 ("the Subject Property"), to "buy out" an interest in the Subject Property owned by Defendant's former spouse, to pay for legal services received by Defendant and to defray Defendant's living expenses.  On information and belief, Defendant agreed to repay the Subject Loans in the same manner as Defendant was repaying the existing bank mortgage, but at an annual interest rate to be negotiated by the parties ("the Agreement").  In part, the purpose of the Agreement was to reduce the financial burden of the bank mortgage on Defendant.  A true and correct copy of the Description of the Subject Property is attached as Exhibit 13.

19.    From about October 2002 to the present, Plaintiff, through his attorneys Artiano, Guzman & Toomey, LLP ("AGT") (now Guzman & Lou, LLP ("G&L")), regularly and frequently contacted Defendant by letter and telephone to request that Defendant begin repaying the Subject Loans pursuant to the Agreement.  In the course of said contacts, Plaintiff provided notice that Defendant was in continuous default in repaying the Subject Loans.  During said discussions from about October 2002 to as late as about March 2007, the parties negotiated specific terms of the Agreement.  During said discussions, Defendant did

not dispute its obligation under the Agreement to repay the Subject Loans with interest.

20.     On or about January 16, 2003, Defendant prepared and sent to Plaintiff the January 2003 Mortgage, Mortgage Note and Note. (See Exhibits 1, 2 and 3). In a cover letter dated January 16, 2003 accompanying said documents, Defendant purported to enclose "a draft of the Mortgage Note, Mortgage and Note for my loan transaction with [Plaintiff]." A true and correct copy of the January 16, 2003 cover letter is attached as Exhibit 14.

21.     The January 2003 Mortgage defines Defendant as Borrower and Plaintiff as Lender. The January 2003 Mortgage specifies that Defendant owes Plaintiff $170,000 plus interest and other amounts that may be payable. (See Exhibit 1, p. 1).

22.     The January 2003 Mortgage specifies that Defendant mortgages, grants and conveys the Subject Property to Plaintiff against Defendant's obligation to repay the amounts specified in the January 2003 Mortgage. (See Exhibit 1, p. 2).

23.     The January 2003 Mortgage specifies that the Mortgage is governed by federal law and the law of New York State. (See Exhibit 1, p. 10).

24.     The January 2003 Mortgage specifies that, if Defendant fails to fulfill the obligations under the Mortgage, Plaintiff may require immediate payment in full of the remaining unpaid balance, may initiate litigation to take away all remaining rights of Defendant in the Subject Property and have the Subject Property sold and may collect all attorneys' fees and costs, which fees shall become part of the obligations secured by the Subject Property. (See Exhibit 1, p. 12).

25.     The January 2003 Mortgage Note specifies repayment by Defendant of a principal amount of $170,000 at 4.45% interest per year, with monthly installments of $856.32 to be paid by Defendant beginning March 1, 2003 and ending February 1, 2033. (See Exhibit 2, ¶¶

1-3).

26.    The January 2003 Mortgage Note specifies that Defendant will be in default if Defendant does not pay the full amount of each monthly payment on the date it is due. (See Exhibit 2, ¶ 6(E)).

27.    The January 2003 Mortgage Note specifies that if Defendant is in default, Plaintiff may require immediate repayment of all principal and unpaid accrued interest and is entitled to all costs and expenses incurred by Plaintiff in the collection of the Mortgage Note, including reasonable attorneys' fees. (See Exhibit 2, ¶ 22).

28.    The January 2003 Note specifies repayment by Defendant to Plaintiff of a principal amount of $80,000 at 4.45% interest per year, with monthly interest-only installments to be paid by Defendant beginning February 1, 2004 and ending February 1, 2033. (See Exhibit 3, p. 1).

29.    The January 2003 Note specifies that Defendant will be in default if Defendant does not pay the full amount of each annual interest payment by the end of fifteen calendar days after the date it is due. (See Exhibit 3, p. 1).

30.    The January 2003 Note specifies that if Defendant is in default, Plaintiff may require immediate repayment of all principal and unpaid accrued interest and is entitled to all costs and expenses incurred by Plaintiff in the collection of the Note, including reasonable attorneys' fees. (See Exhibit 3, p. 1).

31.    On or about January 22, 2003, Defendant amended the mortgagee declaration in an insurance policy ("the Policy") applicable to the Subject Property. The Policy was issued by the Amica Mutual Insurance Company and was renewable annually. Defendant amended the Policy to name Plaintiff as Mortgagee of the Subject Property. First Union National Bank is

7

named Second Mortgagee of the Subject Property. A true and correct copy of the Amended

Declarations for the Policy is attached as Exhibit 15.

32.     On or about May 1, 2003 and July 21, 2003, Plaintiff, through attorneys AGT,

corresponded with Defendant to request that Defendant begin repaying the Subject Loans

outstanding as of those dates. True and correct copies of the May 1, 2003 and July 21, 2003

correspondence are attached as Exhibits 16 and 17.

33.     On or about March 23, 2004, Plaintiff, through attorneys AGT, sent correspondence

to Defendant enclosing a Mortgage and Note specifying a principal of $177,721.20, which

included the $170,000 principal recited in the January 2003 Mortgage Note and Mortgage

plus unpaid accrued interest, and a Mortgage and New York Balloon Note specifying a

principal of $83,633.52, which included the $80,000 principal recited in the January 2003

Note plus unpaid accrued interest. True and correct copies of the March 2004

correspondence, Mortgages, Note and New York Balloon Note are attached as Exhibits 18,

19, 20, 21 and 22, respectively.

34.     The March 2004 Mortgages, Note and New York Balloon Note additionally recited

proposed revised interest rates and a revised repayment term for the $83,633.52 loan but

otherwise contained substantially the same provisions as the January 2003 Mortgage Note,

Mortgage and Note.

35.     In preparing the March 2004 Mortgages, Note and New York Balloon Note, Plaintiff

incorporated the $170,000 and $80,000 principal amounts specified by Defendant in the

January 2003 Mortgage Note, Mortgage and Note.

36.     During the time period from about April 2004 to about June 2004, Plaintiff, through

attorneys AGT, contacted and attempted to contact Defendant by telephone regarding the

March 2004 Mortgages, Note and New York Balloon Note and payments due thereon.

During one telephone conference on or about June 4, 2004, Defendant agreed to secure the

$177,721.20 loan and agreed to a thirty year term for the $83,633.52 loan. Defendant

objected to the proposed revised interest rates to the extent that the resulting monthly

payments would exceed the monthly payments due under Defendant's original home

mortgage.

37.     On or about August 17, 2004, Plaintiff, through attorneys AGT, informed Defendant

of Plaintiff's decision to approve all terms proposed by Defendant during the telephone

conference on or about June 4, 2004 for the March 2004 Mortgages, Note and New York

Balloon Note and requested a payment schedule from Defendant. A true and correct copy of

correspondence dated August 17, 2004 is attached as Exhibit 23.

38.     Despite Plaintiff's agreement to Defendant's proposed terms, and despite Plaintiff's

continued demands between about August 17, 2004 and the present for Defendant to begin

repaying the Subject Loans, Defendant has failed to honor the Agreement and has made no

payments.

39.     On or about February 23, 2005, Plaintiff, through attorneys AGT, sent

correspondence to Defendant requesting that Defendant begin repaying the Subject Loans.

The February 2005 correspondence indicated that two promissory notes and a mortgage

reflecting updated principal amounts due on both notes were enclosed. According to the

February 2005 correspondence, the updated principal due on the loan recited in the January

2003 Mortgage Note and Mortgage was $185,150, which included the $170,000 principal

plus unpaid accrued interest. According to the February 2005 correspondence, the updated

principal due on the loan recited in the January 2003 Note was $82,200, which included the

$80,000 principal plus unpaid accrued interest. True and correct copies of the February 2005 correspondence and Note for the $82,200 loan are attached as Exhibits 24 and 25, respectively.

40.     On or about February 13, 2007, Plaintiff, through attorneys AGT, sent correspondence to Defendant requesting that Defendant begin repaying the Subject Loans and enclosing a Mortgage, Note and Promissory Note reflecting updated loan totals due under the March 2004 Mortgages, Note and New York Balloon Note. The February 2007 Mortgage and Note specified a principal of $200,931, which included the $170,000 principal recited in the January 2003 Mortgage Note and Mortgage plus unpaid accrued interest. The February 2007 Promissory Note specified a principal of $89,616, which included the $80,000 principal recited in the January 2003 Note plus unpaid accrued interest at the interest rate specified in the January 2003 Note. True and correct copies of the February 2007 correspondence, Mortgage, Note and Promissory Note are attached as Exhibits 26, 27, 28 and 29, respectively.

41.     On or about April 10, 2007, Plaintiff, through attorneys AGT, again requested that Defendant repay the Subject Loans. Plaintiff reviewed the January 2003 Mortgage, Mortgage Note and Note and noted that the accompanying correspondence from Defendant stated that these documents were for Defendant's loan from Plaintiff in the amount of $250,000. Plaintiff informed Defendant that a search of Plaintiff's records showed that the Subject Loans, which Defendant was obligated to repay pursuant to the Agreement, in fact totaled $296,610.80 in principal. Plaintiff enclosed a list itemizing the dates and amounts of the Subject Loans. A true and correct copy of the April 2007 correspondence is attached as Exhibit 30.

10

FIRST CAUSE OF ACTION
BREACH OF IMPLIED CONTRACT

42.    Plaintiff realleges and reasserts Paragraphs 1 through 41 as if fully set forth and restated herein.

43.    Plaintiff and Defendant reached the Agreement obligating Plaintiff to provide the Subject Loans to Defendant and obligating Defendant to repay the Subject Loans with interest. Plaintiff and Defendant memorialized the terms of the Agreement in the January 2003 Mortgage Note, the January 2003 Mortgage, the January 2003 Note, the revised versions thereof and correspondence between the parties subsequent to the formation of the Agreement. Defendant additionally amended the Policy to name Plaintiff as Mortgagee of the Subject Property.

44.    Plaintiff sent the Subject Loans to Defendant pursuant to the Agreement and has fully performed all of Plaintiff's obligations under the Agreement.

45.    Defendant has failed and refused to repay any portion of the Subject Loans or to otherwise satisfy Defendant's obligations under the Agreement.

46.    As a direct and proximate cause of Defendant's breach of the Agreement, Plaintiff has suffered and continues to suffer damages.

47.    Consequently, Defendant has wrongfully and dishonorably denied Plaintiff's expectation interests, per the terms of the Agreement. Plaintiff therefore is entitled to damages and other equitable relief which flow from the breach.

48.    The January 2003 Mortgage, January 2003 Mortgage Note and January 2003 Note, and all revised versions thereof, each specify that Defendant agrees to pay all costs and expenses, including reasonable attorneys' fees, incurred by Plaintiff in the collection of the Subject Loans.

49.    As a direct and proximate cause of Defendant's breach of the Agreement and

Plaintiff's attempts to enforce Defendant's performance arising thereunder, Plaintiff has

incurred, and continues to incur, costs and expenses, including reasonable attorneys' fees.

SECOND CAUSE OF ACTION
UNJUST ENRICHMENT

50.    Plaintiff realleges and reasserts Paragraphs 1 through 49 as if fully set forth and

restated herein.

51.    Defendant directly benefited from the Subject Loans.

52.    Defendant was unjustly enriched at Plaintiff's expense by failing to repay any portion

of the Subject Loans.

53.    The circumstances of Defendant's unjust enrichment are such that Defendant is

obligated to make restitution to Plaintiff.

54.    As a direct and proximate result of Defendant's unjust enrichment, Plaintiff has

suffered and continues to suffer damages.

THIRD CAUSE OF ACTION
FRAUD

55.    Plaintiff realleges and reasserts Paragraphs 1 through 54 as if fully set forth and

restated herein.

56.    As part of the Agreement, Defendant agreed to repay the Subject Loans to Plaintiff.

57.    In reasonable reliance upon Defendant's representations, Plaintiff sent the Subject

Loans to Defendant.

58.    Defendant's representations that the Subject Loans would be repaid were materially

false and misleading.

59.    As a direct and proximate result of Plaintiff's reasonable reliance on Defendant's

material representations, wrongful deception and fraudulent conduct, Plaintiff has suffered

and continues to suffer damages.

FOURTH CAUSE OF ACTION
CONVERSION

60.    Plaintiff realleges and reasserts Paragraphs 1 through 59 as if fully set forth and

restated herein.

61.    Defendant has engaged in an unauthorized assumption and exercise of ownership over

the Subject Loans.

62.    Defendant is acting in an unauthorized way and without appropriate right, depriving

Plaintiff of ownership rights in the Subject Loans.

63.    As a direct and proximate result of Defendant's unauthorized assumption and exercise

of ownership over the Subject Loans, Plaintiff has suffered and continues to suffer damages.

FIFTH CAUSE OF ACTION
BREACH OF IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING

64.    Plaintiff realleges and reasserts Paragraphs 1 through 63 as if fully set forth and

restated herein.

65.    The Agreement contains an implied covenant of good faith and fair dealing, which

requires Defendant not do anything to destroy Plaintiff's right to receive the benefits of the

Agreement.

66.    Defendant has breached the aforesaid implied covenant by engaging in those

wrongful acts set forth herein above. In so doing, Defendant has acted willfully and

maliciously with intent to injure Plaintiff.

67.    As a direct and proximate result of Defendant's wrongful acts, Plaintiff has suffered

and continues to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff asks that this Court:

A.      Award damages in an amount proven at trial, but in no event less than the Subject Loans

plus interest;

B.      Award Plaintiff's costs in bringing this action or any related action or proceeding to

recover the Subject Loans;

C.      Award Plaintiff's attorneys' fees incurred in bringing this action;

D.      Award such other relief as the Court deems necessary and appropriate; and

E.      Order the Subject Property sold at auction to recoup the Subject Loans.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all

issues and causes of action so triable herein.

Respectfully submitted,

Dated: April 10, 2008

Robert L. Powley (RP 7674)
James M. Gibson (JG 9234)
David J. Lorenz (DL 3072)
Powley & Gibson, P.C.
304 Hudson Street, 2nd Floor
New York, New York 10013
(212) 226-5054

Attorneys for Plaintiff
Allan S. Larson

EXHIBIT  2



ATTORNEYS AT LAW

Denise M. Guzman
Extension 106
denise.guzman@agtlaw.com

<u>Via Regular Mail</u>

July 25, 2003

Jaine Elkind Eney
9 Kilmer Road
Larchmont, New York 10538

Re:    Loan from Al Larson
       Our File No. B224.13

Dear Jaine:

As you know, from our conversations this year, I am in the process of
formalizing a number of loans that Al has made to his family of friends, in the
past few years. I am sending all recipients, of these loans, the same letter for
purposes of explanation. This information may be something that you already
know, since you are a real estate attorney, but it contains information that is
specific to your loan.

Al's records indicate, that prior to any monies that he has transferred to you this
year, that there was a cumulative loan amount of $100,000 outstanding. I know
that in one of our phone conversations you stated to me that you did not think
that the previous loans were that high. Can you please send me your records of
the loans so that I may compare them to Al's ledger.

You have also sent me loan documents for $80,000, in January 2003. The last
time we spoke in April, you were to amend this document to reflect additional
sums that Al would be lending to you.

From your own conversations with Al, you know that he does not want to place
any pressure on you to pay back the loans. However, there are severe tax
consequences to Al and Nan if payments are never made, or if the intent to pay
back is never established.

At minimum, Al and Nan will need you to make monthly (or yearly) interest
payments on the principal borrowed. These interest amounts cannot be forgiven
by gifts, since this is exactly the issue that we are trying to avoid classification in
with the IRS. If interest payments are at least made, this will eliminate the IRS

Artiano, Guzman
& Toomey, LLP
3828 Carson Street
Suite 102
Torrance, CA 90503-6702
Telephone: 310.543.1240
Facsimile: 310.543.9850

Jaine Eney
July 25, 2003
Page 2

from categorizing the transactions as a gift, and charging a gift tax to Al and Nan for the entire amount.

I understand, from speaking with Al, that you have named him as a beneficiary on your life insurance policy. That gesture is appreciated by Al. Naming him as a beneficiary could go to prove your intent to pay him back, however, because of your age, and presumed age of death, repayment on the loan would not be effectuated during Al's lifetime, and therefore, it could still be argued by the IRS that the transfer of funds to you was a gift from Al.

Please keep me posted on the formal written mortgage that you will amend, once a final number has been reached between you and Al. Please call me if you have any questions. Again, I emphasize that Al does not want to place any undue burden on you, but he also wants to be protected from incurring any additional taxation.

Please call me so that we may discuss the current principal amount borrowed, interest rate for the loan, and a payment schedule for interest payments.

Thank you for your understanding in this matter, Jaine.

Talk to you soon.

Very truly yours,

Denise M. Guzman

cc:     Al and Nan Larson

EXHIBIT  3



**A · G**

ATTORNEYS AT LAW

Denise M. Guzman
Extension 106
denise.guzman@agtlaw.com

February 13, 2007

**<u>SENT VIA OVERNIGHT DELIVERY</u>**

Jaine Elkind Eney
9 Kilmer Road
Larchmont, New York 10538

Re:   *Loans from Al Larson*
      *Our File No.: B224.13.2*

Dear Ms. Eney:

This letter serves as a follow up to our previous communications in connection with the above-referenced matter.

Enclosed please find for your review and execution the following documents:

- Mortgage;
- Note;
- Promissory Note; and
- Initialization Information

We have updated the principal amounts due under both loans made to you from Al Larson by adding interest (4.45% per annum) to the principal amount owed from day one through February 1, 2007.  Thus, the $170,000 loan made to you on January 1, 2003 has an unpaid principal balance of $200,931 as of February 1, 2007; and the $80,000 loan made to you on January 1, 2003 has an unpaid principal balance of $89,616 as of February 1, 2007.

Enclosed herewith, please find two (2) Promissory Notes and one (1) Mortgage that reflect the updated principal amounts due on both Notes.  These Notes also reflect all of the terms requested by you.  Therefore, we removed all of the obstacles you claimed that prevented you from executing the Notes and Mortgage previously sent to you.

Artiano · Guzman, LLP
3828 Carson Street, Suite 102
Torrance, CA 90503
Telephone: 310/543-1240
Facsimile: 310/543-9850

Jaine Elkind Eney / Lars
February 13, 2007
Page 2

Please review these documents, sign where indicated and return them to our office.

I thank you for your attention to this matter.  Please do not hesitate to contact our office should you have any questions.

Very truly yours,

ARTIANO • GUZMAN, LLP

Denise M. Guzman

DMG/kj

Enclosures

_____[Space Above This Line For Recording Data]_____

# MORTGAGE

## WORDS USED OFTEN IN THIS DOCUMENT

(A) "Security Instrument." This document, which is dated February    , 2007    , will be called the "Security Instrument."

(B) "Borrower."   JAINE ELKIND ENEY

Whose address is 9 Kilmer Rd., Larchmont, NY 10538                              , sometimes will be called "Borrower" and sometimes simply "I" or "me."                              , (C) "Lender."

Allan S. Larson

will be called "Lender." Lender is a corporation or association which exists under the laws of
. Lender's address is 13603 Marina Pointe Dr., Marina del Rey,
California, 90292.

(D) "Note." The note signed by Borrower and dated February ___, 2007          , will be called the "Note."
The Note shows that I owe Lender TWO HUNDRED THOUSAND NINE HUNDRED THIRTY ONE 00/100
Dollars (U.S. $ 200,931.00          ) plus interest.
I have promised to pay this debt in monthly payments and to pay the debt in full by February 1, 2037      .

(E) "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(F) "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument.  This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property.  I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note;

(B) Pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 of this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument.

**NEW YORK** - Single Family - **FNMA/FHLMC UNIFORM INSTRUMENT**          **Form 3033 10/91**

**DESCRIPTION OF THE PROPERTY**
I give Lender rights in the Property described in (A) through (G) below:
(A) The Property which is located at 9 Kilmer Road

[Street]

Larchmont , New York    10538    . This Property is in

[City]    [Zip Code]

Westchester    County. It has the following legal description:

(B) All buildings and other improvements that are located on the Property described in subparagraph (A) of this section;
(C) All rights in other property that I have as owner of the Property described in subparagraph (A) of this section. These rights are known as "easements and appurtenances attached to the Property";
(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subparagraph (A) of this section;
(E) All fixtures that are now or in the future will be on the Property described in subparagraphs (A) and (B) of this section;
(F) All of the rights and property described in subparagraphs (B) through (E) of this section that I acquire in the future; and
(G) All replacements of or additions to the Property described in subparagraphs (B) through (F) of this section.

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**
I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and
(C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

**PLAIN LANGUAGE SECURITY INSTRUMENT**
This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary, to a limited extent, in different parts of the country. My promises and agreements are stated in "plain language."

# COVENANTS

I promise and I agree with Lender as follows:

## 1. BORROWER'S PROMISE TO PAY
I will pay to Lender on time principal and interest due under the Note and any prepayment and late charges due under the Note.

## 2. MONTHLY PAYMENTS FOR TAXES AND INSURANCE
### (A) Borrower's Obligations
I will pay to Lender all amounts necessary to pay for taxes, assessments, water frontage charges and other similar charges, sewer rents, leasehold payments or ground rents (if any), hazard or property insurance covering the Property, and flood insurance (if any). If Lender required mortgage insurance as a condition of making the loan that I promise to pay under the Note, (i) I also will pay to Lender all amounts necessary to pay for mortgage insurance, and (ii) if, under Paragraph 8 below, instead of paying for mortgage insurance I am required to pay Lender an amount equal to the cost of mortgage insurance, I will pay this amount to Lender. I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless the law requires otherwise. I will make these payments on the same day that my monthly payments of principal and interest are due under the note.

My payments under this Paragraph 2 will be for the items listed in (i) through (vi) below, which are called "Escrow Items":
(i) The estimated yearly taxes, assessments, water frontage charges and other similar charges, and sewer rents on the Property which under the law may be superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "lien";
(ii) The estimated yearly leasehold payments or ground rents on the Property (if any);
(iii) The estimated yearly premium for hazard or property insurance covering the Property;
(iv) The estimated yearly premium for flood insurance covering the Property (if any);
(v) The estimated yearly premium for mortgage insurance (if any); and
(vi) The estimated yearly amount I may be required to pay Lender under Paragraph 8 below instead of the payment of the estimated yearly premium for mortgage insurance (if any).

Lender will estimate from time to time the amount I will have to pay for Escrow Items by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless the law requires Lender to use another method for determining the amount I am to pay. The amounts that I pay to Lender for Escrow Items under this Paragraph 2 will be called the "Funds." The Funds are pledged as additional security for all Sums Secured.

The law puts limits on the total amount of Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender for a "federally related mortgage loan" could require me to place in an "escrow account" under the federal law called the "Real Estate Settlement Procedures Act of 1974," as that law may be amended from time to time. If there is another law that imposes a lower limit on the total amount of Funds Lender can collect and hold, Lender will limited to the lower amount.

### (B) Lender's Obligations
Lender will keep the Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank, if Lender is such a savings or banking institution, Lender may hold the Funds. Except as described in this Paragraph 2, Lender will use the Funds to pay the Escrow Items. Lender will give to me, without charge, an annual accounting of the Funds. That accounting must show all additions to and deductions from the Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Funds, for using the Funds to pay Escrow Items, for making a yearly analysis of my payment of Funds or for receiving, verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Funds and if the Law permits Lender to make such a charge. Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with my loan, unless the law does not permit Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Funds unless either (i) Lender and I agree in writing, at the time I sign this Security Instrument, that Lender will pay interest on the Funds; or (ii) the law requires Lender to pay interest on the Funds.

### (C) Adjustments to the Funds
Under the law, there is a limit on the amount of Funds Lender may hold. If the amount of Funds held by Lender exceeds this limit, then the law requires Lender to account to me in a special manner for the excess amount of Funds. There will be an excess amount if, at any time, the amount of Funds which Lender is holding or keeping is greater that the amount of Funds Lender is allowed to hold under the law.

If, at any time, Lender has not received enough Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items in full. Lender will determine the number of monthly payments I have in which to pay that additional amount, but the number of payments will not be more than twelve.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Funds that are then being held by Lender. If, under Paragraph 21 below, Lender either acquires or sells the Property, then before the acquisition or sale, Lender will use any Funds which Lender is holding at the time of the acquisition or sale to reduce the Sums Secured.

## 3. APPLICATION OF BORROWER'S PAYMENTS

Unless the law requires otherwise, Lender will apply each of my payments under the Note and under Paragraphs 1 and 2 above in the following order and for the following purposes:
First, to pay any prepayment charges due under the Note;
Next, to pay the amounts due to Lender under Paragraph 2 above;
Next, to pay interest due;
Next, to pay principal due; and
Last, to pay any late charges due under the Note.

## 4. BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS

I will pay all taxes, assessments, water frontage charges and other similar charges, sewer rents, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will do this either by making the payments to Lender that are described in Paragraph 2 above or, if I am not required to make payments under Paragraph 2, by making the payments on time to the person owed them. (In this Security Instrument, the word "person" means any person, organization, governmental authority or other party.) If I make direct payments, then promptly after making any of those payments I will give Lender a receipt which shows that I have done so. If I make payment to Lender under Paragraph 2, I will give Lender all notices or bills that I receive for the amounts due under this Paragraph 4.

I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that during the lawsuit, the superior lien may not be enforced; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Borrower a notice identifying the superoir lien. Borrower shall pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

## 5. BORROWER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE OR PROPERTY INSURANCE

I will obtain hazard or property insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage cause by fire, hazards normally cover by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage, including floods and flooding. The insurance must be in the amounts and for the periods of time required by Lender and may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. If I do not maintain the insurance coverage described above, Lender may obtain insurance coverage to protect Lender's rights in the Property in accordance with Paragraph 7 below.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgage clause" to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds". The proceeds will be used to repair or to restore the damaged Property unless: (A) it is not economically feasible to make the repairs or restoration; or (B) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (C) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that I owe to Lender under the Note and under this Security Instrument. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Note, that use will not delay the due date or change the amount of any of my monthly payments under the Note and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays or changes.

If Lender acquires the Property under Paragraph 21 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occured before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater that the Sums Secured immediately before the Property is acquired by Lender or sold.

## 6. BORROWER'S OBLIGATIONS TO OCCUPY THE PROPERTY, TO MAINTAIN AND PROTECT THE PROPERTY, AND TO FULFILL ANY LEASE OBLIGATIONS; BORROWER'S LOAN APPLICATION

### (A) Borrower's Obligations to Occupy the Property

I will occupy the Property and use the Property as my principal residence within sixty days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and us4e the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

### (B) Borrower's Obligations to Maintain and Protect the Property

I will keep the Property in good repair. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate.

I will be "in default" under this Security Instrument if I fail to keep any promise or agreement made in this Security Instrument. I also will be in default under this Security Instrument if any civil or criminal action or proceeding for "forfeiture" (that is, a legal action or proceeding to require the Property, or any part of the Property, to be given up) is begun and Lender determines, in good faith, that this action or proceeding could result in a court ruling (i) that would require forfeiture of the Property or (ii) that would materially impair the lien of this Security Instrument or Lender's rights in the Property. I may correct the default by obtaining a court ruling that dismisses the legal action or proceeding, if Lender determines, in good faith, that this court ruling prevents forfeiture of my interests in the Property and also prevents any material impairment of (i) the lien created by this Security Instrument or (ii) Lender's rights in the Property. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Paragraph 18 below, even if Lender has required immediate payment in full.

### (C) Borrower's Obligations to Fulfill Any Lease Obligations

If I do not own but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

### (D) Borrower's Loan Application

If, during the application process for the loan that I promise to pay under the Note, I made false or inaccurate statements to Lender about information important to Lender in determining my eligibility for the loan, Lender will treat my actions as a default under this Security Instrument. False or inaccurate statements about information important to Lender would include a misrepresentation of my intentions to occupy the Property as a principal residence. This is just one example of a false or inaccurate statement of important information. Also, if during the loan application process I failed to provide Lender with information important to Lender in determining my eligibilty for the loan, Lender will treat this as a default under this Security Instrument.

## 7. LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or forfeiture, or to enforce laws or regulations), Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 7, Lender does not have to do so.

I will pay to Lender any amounts, with interest, which Lender spends under this Paragraph 7. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will also pay interest on those amounts at the Note rate. Interest on each amount will begin on the date that the amount is spent by Lender. However, Lender and I may agree in writing to terms of payment that are different from those in this paragraph. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

## 8. MORTGAGE INSURANCE

If Lender required mortgage insurance as a condition of making the loan that I promise to pay under the Note, I will pay the premiums for the mortgage insurance. If, for any reason, the mortgage insurance coverage lapses or ceases to be in effect, I will pay the premiums for substantially equivalent mortgage insurance coverage. However, the cost of this mortgage insurance coverage must be substantially equivalent to the cost to me of the previous mortgage insurance coverage, and the alternate mortgage insurer must be approved by Lender.

If substantially equivalent mortgage insurance coverage is not available, Lender will establish a "loss reserve" as a substitute for the mortgage insurnace coverage. I will pay to Lender each month an amount equal to one-twelfth of the yearly mortgage insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the mortgage insurance would have covered. Lender may choose to no longer require loss reserve payments, if mortgage insurance coverage again becomes available and is obtained. The mortgage insurance coverage must be in the amount and for the period of time required by Lender. The Lender must approve the insurance company providing the coverage.

I will pay the mortgage insurance premiums, or the loss reserve payments, until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law. Lender may require me to pay the premiums, or the loss reserve payments, in the manner described in Paragraph 8 above.

## 9. LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

## 10. AGREEMENT ABOUT CONDEMNATION OF THE PROPERTY

A taking of Property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (A) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking either is equal to, or greater than, the amount of the Sums Secured immediately before the taking, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by a fraction. That fraction is as follows: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

Unless Lender and I agree otherwise in writing or unless the law requires otherwise, if only a part of the Property is taken, and the fair market value of the Property immediately before the taking is less than the amount of the Sums Secured immediately before the taking, the proceeds will be used to reduce the Sums Secured.

If I abandon the Property, or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Note, that use will not delay the due date or change the amount of any of my monthly payments under the Note and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to those delays of changes.

**11. CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**
**(A) Borrower's Obligations**
Lender may allow a person who takes over my rights and obligations to delay or to change the amount of the monthly payments of principal and interest due under the Note or under this Security Instrument. Even if Lender does this, however, that person and I will both still be fully obligated under the Note and under this Security Instrument.

Lender may allow those delays or changes for a person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Note or under this Security Instrument, even if Lender is requested to do so.

**(B) Lender's Rights**
Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 21 below to demand that I make immediate payment in full of the amount that I owe to Lender under the Note and under this Security Instrument.

**12. OBLIGATIONS OF BORROWER AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**
Any person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (A) that person is signing this Security Instrument only to give that person's rights in the Property to Lender under the terms on this Security Instrument; and (B) that person is not personally obligated to pay the Sums Secured; and (C) that person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights or to modify or make any accommodations with regard to the terms of this Security Instrument or the Note without that person's consent.

**13. LOAN CHARGES**
If the loan secured by this Security Instrument is subject to a law which sets maxium loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and  (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**
Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at the address stated in the section above titled "Description of the Property." A notice will be given to me at a different address if I give Lender a notice of my different address. Any notice that must be given to Lender under this Security Instrument will be given by mailing it to Lender's address stated in subparagraph (C) of the section above title "Words Used Often In This Document." A notice will be mailed to Lender at a different address if Lender gives me a notice of the different address. A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

**15. LAW THAT GOVERNS THIS SECURITY INSTRUMENT**
This Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Security Instrument or of the Note conflicts with the law,  all other terms of this Security Instrument and of the Note will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Security Instrument and of the Note which conflict with the law can be separated from the remaining terms, and the remaining terms will still  be enforced.

**16. BORROWER'S COPY**
I will be given one conformed copy of the Note and of this Security Instrument.

**17. AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**
Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Security Instrument.

If Lender requires immediate payment in full under this Paragraph 17, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**18. BORROWER'S RIGHT TO HAVE LENDER'S ENFORCEMENT OF THIS SECURITY INSTRUMENT DISCONTINUED**
Even if Lender has required immediate payment in full, I may have the right to have enforcement of this Security Instrument discontinued. I will have this right at any time before sale of the Property under any power of sale granted by this Security Instrument or any time before a judgment has been entered enforcing this Security Instrument if I meet the following conditions:
(A) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if immediate payment in full had never been required; and
(B) I correct my failure to keep any of my other promises or agreements made in this Security Instrument; and
(C) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees; and
(D) I do whatever Lender reasonably requires to assure that Lender's rights in the Property, Lender's rights under this Security Instrument, and my obligations under the Note and under this Security Instrument continue unchanged.

If I fulfill all of the conditions in this Paragraph 18, then the Note and this Security Instrument will remain in full effect as if immediate payment in full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required immediate payment in full under Paragraph 17 above.

**19. NOTE HOLDER'S RIGHT TO SELL THE NOTE OR AN INTEREST IN THE NOTE; BORROWER'S RIGHT TO NOTICE OF CHANGE OF LOAN SERVICER**
The Note, or an interest in the Note, together with this Security Instrument, maybe sold one or more times. I may not receive any prior notice of these sales.

The entity that collects my monthly payments due under the Note and this Security Instrument is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note, there also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. The law requires that I be given written notice of any change of the Loan Servicer. The written notice must be given in the manner required under Paragraph 14 above and under applicable law. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by the law.

**20. CONTINUATION OF BORROWER'S OBLIGATIONS TO MAINTAIN AND PROTECT THE PROPERTY**
The federal laws and the laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection are called "Environmental Laws." I will not do anything affecting the Property that violates Environmental Laws, and I will not allow anyone else to do so.

Environmental Laws classify certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Paragraph 20. These are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Laws and the substances considered hazardous for purposes of this Paragraph 20 are called "Hazardous Substances."

I will not permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property, and I also will not allow anyone else to do so. I will not dispose of Hazadous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. However, I may permit the presence on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property, and I may use or store these small quantities on the Property. In addition, unless the law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

If I know of any investigation, claim, demand, lawsuit or other action by the government or by a private party involving the Property and any Hazardous Substance or Environmental Laws, I will promptly notify the Lender in writing. If the government notifies me (or I otherwise learn) that it is necessary to remove a Hazardous Substance affecting the Property or to take other remedial actions, I will promptly take all necessary remedial actions as required by Environmental Laws.

## 21. LENDER'S RIGHTS IF BORROWER FAILS TO KEEP PROMISES AND AGREEMENTS

Except as provided in Paragraph 17 above, if all of the conditions stated in subparagraphs (A), (B) and (C) of this Paragraph 21 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "immediate payment in full."

If Lender requires immediate payment in full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale." In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require immediate payment in full under this Paragraph 21 only if all of the following conditions are met:

(A) I fail to keep any promise or agreement made in this Security Instrument, including the promises to pay when due the Sums Secured.

(B) Lender sends to me, in the manner described in Paragraph 14 above, a notice that states:
    (i) The promise or agreement that I failed to keep;
    (ii) The action that I must take to correct that default;
    (iii) A date by which I must correct the default. That date must be at least 30 days from the date on which the notice is given;
    (iv) That if I do not correct the default by the date stated in the notice, Lender may require immediate payment in full, and Lender or another person may acquire the Property by means of foreclosure and sale;
    (v) That if I meet the conditions stated in Paragraph 18 above, I will have the right to have Lender's enforcememt of this Security Instrument discontinued and to have the Note and this Security Instrument remain fully effective as if immediate payment in full had never been required; and
    (vi) That I have the right in any lawsuit for foreclosure and sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have.

(C) I do not correct the default stated in the notice from Lender by the date stated in that notice.

## 22. LENDER'S OBLIGATION TO DISCHARGE THE SECURITY INSTRUMENT

When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

## 23. AGREEMENTS ABOUT NEW YORK LIEN LAW

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 on the New York Lien Law. This means that if, on the date this Security Instrument is recorded, construction or other work on any building or other improvement located on the Property has not been completed for at least four months, I will: (A) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a "trust fund"; and (B) use those amounts to pay for that construction or work before I use them for any other purpose. The fact that I am holding those amounts as a "trust fund" means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Paragraph 23.

**24. RIDERS TO THIS SECURITY INSTRUMENT**

If one or more riders are signed by Borrower and recorded together with this Security Instrument, the promises and agreements of each rider are incorporated as a part of this Security Instrument. [Check applicable box(es)]

☐ Adjustable Rate Rider      ☐ Condominium Rider      ☐ 1-4 Family Rider
☐ Graduated Payment Rider      ☐ Planned Unit Development Rider      ☐ Biweekly Payment Rider
☐ Balloon Rider      ☐ Rate Improvement Rider      ☐ Second Home Rider

☐ VA Rider      ☐ Other(s) [specify]

       BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 10 of this Security Instrument and in any rider(s) signed by me and recorded with it.

Witnesses:

_____      _____ (Seal)
               Jaine Elkind Eney          -Borrower

_____      _____ (Seal)
                                                   -Borrower

_____ (Seal)      _____ (Seal)
                       -Borrower                                              -Borrower

**STATE OF NEW YORK**
                                    )
                                    )ss.
County of                              )

       On the          day of              in the year             before me, the undersigned, a notary public in and for said state, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

My Commission Expires:

_____
           Notary Public

Tax Map Information:

Form 3033 10/91

# NOTE

[Date] FEBRUARY _____,2007                    [City] LARCHMONT                    [State] NEW YORK

9 KILMER ROAD, LARCHMONT, NEW YORK.

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 200,931.00              (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is  Allan S. Larson

. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of  4.45              %.

The interest rate required by this Section 2 is the rate I will pay both before and after my default as described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the  1st      day of each month beginning on  March 1, 2007                   ,
. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on         March 1, 2037 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 13603 Marina Pointe Dr., California 90292
                                    or at a different place if required by the Note Holder.

**(B)  Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ 1,012.13                    .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (I) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payments by the end of  15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  3              % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to he Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address slated in Section 3(A) above or at a different address if I am given notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of dishonor" means the right to require Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.  Lender also may require immediate payment in full if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person.  However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Security Instrument.

If Lender requires immediate payment if full under this Paragraph 17, Lender will give me notice which states this requirement.  The notice will give me at least 30 days to make the required payment.  The 30-day period will begin on the date the notice is mailed or delivered.  If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)          _____(Seal)
       JAINE ELKIND ENEY    -Borrower                                                                    -Borrower
SSN:                                                                          SSN:

_____(Seal)          _____(Seal)
                      -Borrower                                                                    -Borrower
SSN:                                                                          SSN:

*[Sign Original Only]*

**Form 3233 10/91**

# PROMISSORY NOTE

For value received, the undersigned hereby jointly and severely promises to pay to the order of ALLAN S. LARSON, or holder, the sum of $ 89,616.00 with interest at the rate of 4.45 % per annum thereon.

Payments under this Note shall commence on the 1st day of March 2007. Payments shall be made monthly thereafter on the 1st day of each month, and shall be for interest only in the sum of not less than $332.33.  All payments shall be first applied to interest (both current and accrued) and the balance to principal.  The entire sum of principal and accrued interest shall be fully payable on March 1, 2037.

This Note may be pre-paid, in whole or in part, without penalty.

This Note shall at the option of any holder hereof be immediately due and payable upon the occurrence of any of the following:

      1.     Failure to make any payment due hereunder within ten (30) days of its due date.

      2.     Breach of any condition of any security agreement or mortgage, if any, having a priority over any security agreement, pledge or mortgage on Collateral granted, in whole or in part, as security for this Note.

      3.     The sale, transfer, assignment, pledge, encumbrance, hypothecation, or any attempted sale, transfer, assignment, pledge, encumbrance, hypothecation, or any other disposal or attempted disposal of the security for this Note, or any right or interest therein.

      4.     The death of the undersigned.

      5.     The filing by any of the undersigned or any guarantor hereof of an assignment for the benefit of creditors, bankruptcy, or for relief under any provisions of the Bankruptcy Code; or by suffering an involuntary petition in bankruptcy or receivership not vacated within 30 days.

In the event this Note shall be in default, and placed with an attorney for collection, then the undersigned agrees to pay all actual attorneys fees and costs of collection.  Payments not made within ten (10) days of the due date shall be subject to a late charge of ten percent (10%) of said payment.  All payments hereunder shall be made to such address as may from time to time be designated by any holder hereof.  This Note is payable in U.S. Dollars.

The undersigned and all other parties to this Note, whether as endorsers, guarantors, or sureties, agree to remain fully bound hereunder until this Note shall be fully paid and waive demand, presentment and protest and all notices

Prepared by
Artiano, Guzman, & Toomey, LLP

thereto and further agree to remain bound, notwithstanding any extension, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this Note, or upon the exchange, substitution, or release of any collateral granted as security for this Note. No modification or indulgence by any holder hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be an indulgence for any other or future occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each of the undersigned, notwithstanding the acknowledgement of any of the undersigned. The rights of any holder hereof shall be cumulative and not necessarily successive. This Note shall take effect as a sealed instrument and shall be construed, governed and enforced in accordance with the laws of the State of California.

   This Note is dated this ___ day of February 2007.


            _____

            Jaine Elking Eney

# Initialization Information

| LOAN DATA | | TABLE DATA | |
|---|---|---|---|
| Loan amount: > | $89,616 | | |
| Annual interest rate: > | 4.45% | Table starts at date: > | 3/1/07 |
| Term in years: > | 30 | or payment number: > | 1 |
| Payments per year: > | 12 | | |
| First payment due: > | 3/1/07 | | |

## Periodic Payment

| | | |
|---|---|---|
| Entered payment: > | $0.00 | *Table uses the calculated periodic payment amount* |
| Calculated payment: > | $451.41 | *unless you enter a value for "Entered payment".* |

## Calculations

| | | |
|---|---|---|
| Use payment of: > | $451.41 | Beginning balance at payment 1: >    $89,616 |
| 1st payment in table: > | 1 | Cumulative interest prior to payment 1: >    $0 |

# Table

Based on payment of >    $451.41    For   30 Years

| No. | Payment Date | Beginning Balance | Interest | Principal | Ending Balance | Cumulative Interest |
|---|---|---|---|---|---|---|
| 1 | 03/01/07 | 89,616.00 | 332.33 | 119.09 | 89,496.91 | 332.33 |
| 2 | 04/01/07 | 89,496.91 | 331.88 | 119.53 | 89,377.39 | 664.21 |
| 3 | 05/01/07 | 89,377.39 | 331.44 | 119.97 | 89,257.41 | 995.65 |
| 4 | 06/01/07 | 89,257.41 | 331.00 | 120.42 | 89,137.00 | 1,326.65 |
| 5 | 07/01/07 | 89,137.00 | 330.55 | 120.86 | 89,016.13 | 1,657.20 |
| 6 | 08/01/07 | 89,016.13 | 330.10 | 121.31 | 88,894.82 | 1,987.30 |
| 7 | 09/01/07 | 88,894.82 | 329.65 | 121.76 | 88,773.06 | 2,316.95 |
| 8 | 10/01/07 | 88,773.06 | 329.20 | 122.21 | 88,650.85 | 2,646.15 |
| 9 | 11/01/07 | 88,650.85 | 328.75 | 122.67 | 88,528.18 | 2,974.90 |
| 10 | 12/01/07 | 88,528.18 | 328.29 | 123.12 | 88,405.06 | 3,303.19 |
| 11 | 01/01/08 | 88,405.06 | 327.84 | 123.58 | 88,281.49 | 3,631.03 |
| 12 | 02/01/08 | 88,281.49 | 327.38 | 124.04 | 88,157.45 | 3,958.40 |
| 13 | 03/01/08 | 88,157.45 | 326.92 | 124.50 | 88,032.96 | 4,285.32 |
| 14 | 04/01/08 | 88,032.96 | 326.46 | 124.96 | 87,908.00 | 4,611.78 |
| 15 | 05/01/08 | 87,908.00 | 325.99 | 125.42 | 87,782.58 | 4,937.77 |
| 16 | 06/01/08 | 87,782.58 | 325.53 | 125.89 | 87,656.69 | 5,263.29 |
| 17 | 07/01/08 | 87,656.69 | 325.06 | 126.35 | 87,530.34 | 5,588.35 |
| 18 | 08/01/08 | 87,530.34 | 324.59 | 126.82 | 87,403.52 | 5,912.95 |
| 19 | 09/01/08 | 87,403.52 | 324.12 | 127.29 | 87,276.23 | 6,237.07 |
| 20 | 10/01/08 | 87,276.23 | 323.65 | 127.76 | 87,148.46 | 6,560.72 |
| 21 | 11/01/08 | 87,148.46 | 323.18 | 128.24 | 87,020.23 | 6,883.89 |
| 22 | 12/01/08 | 87,020.23 | 322.70 | 128.71 | 86,891.52 | 7,206.59 |
| 23 | 01/01/09 | 86,891.52 | 322.22 | 129.19 | 86,762.33 | 7,528.82 |
| 24 | 02/01/09 | 86,762.33 | 321.74 | 129.67 | 86,632.66 | 7,850.56 |
| 25 | 03/01/09 | 86,632.66 | 321.26 | 130.15 | 86,502.51 | 8,171.82 |
| 26 | 04/01/09 | 86,502.51 | 320.78 | 130.63 | 86,371.87 | 8,492.60 |
| 27 | 05/01/09 | 86,371.87 | 320.30 | 131.12 | 86,240.76 | 8,812.90 |
| 28 | 06/01/09 | 86,240.76 | 319.81 | 131.60 | 86,109.15 | 9,132.71 |
| 29 | 07/01/09 | 86,109.15 | 319.32 | 132.09 | 85,977.06 | 9,452.03 |
| 30 | 08/01/09 | 85,977.06 | 318.83 | 132.58 | 85,844.48 | 9,770.86 |
| 31 | 09/01/09 | 85,844.48 | 318.34 | 133.07 | 85,711.41 | 10,089.20 |

2/12/07

# Initialization Information

| LOAN DATA | | TABLE DATA | |
|---|---|---|---|
| Loan amount: > | $89,616 | | |
| Annual interest rate: > | 4.45% | Table starts at date: > | 3/1/07 |
| Term in years: > | 30 | or payment number: > | 1 |
| Payments per year: > | 12 | | |
| First payment due: > | 3/1/07 | | |

## Periodic Payment

| Entered payment: > | $0.00 | *Table uses the calculated periodic payment amount* |
| Calculated payment: > | **$451.41** | *unless you enter a value for "Entered payment".* |

## Calculations

| Use payment of: > | $451.41 | Beginning balance at payment 1: > | $89,616 |
| 1st payment in table: > | 1 | Cumulative interest prior to payment 1: > | $0 |

# Table

*Based on payment of >*     **$451.41**          *For*   **30** *Years*

| No. | Payment Date | Beginning Balance | Interest | Principal | Ending Balance | Cumulative Interest |
|---|---|---|---|---|---|---|
| 32 | 10/01/09 | 85,711.41 | 317.85 | 133.57 | 85,577.84 | 10,407.05 |
| 33 | 11/01/09 | 85,577.84 | 317.35 | 134.06 | 85,443.78 | 10,724.40 |
| 34 | 12/01/09 | 85,443.78 | 316.85 | 134.56 | 85,309.22 | 11,041.25 |
| 35 | 01/01/10 | 85,309.22 | 316.36 | 135.06 | 85,174.17 | 11,357.61 |
| 36 | 02/01/10 | 85,174.17 | 315.85 | 135.56 | 85,038.61 | 11,673.46 |
| 37 | 03/01/10 | 85,038.61 | 315.35 | 136.06 | 84,902.55 | 11,988.81 |
| 38 | 04/01/10 | 84,902.55 | 314.85 | 136.57 | 84,765.98 | 12,303.66 |
| 39 | 05/01/10 | 84,765.98 | 314.34 | 137.07 | 84,628.91 | 12,618.00 |
| 40 | 06/01/10 | 84,628.91 | 313.83 | 137.58 | 84,491.33 | 12,931.83 |
| 41 | 07/01/10 | 84,491.33 | 313.32 | 138.09 | 84,353.24 | 13,245.15 |
| 42 | 08/01/10 | 84,353.24 | 312.81 | 138.60 | 84,214.63 | 13,557.96 |
| 43 | 09/01/10 | 84,214.63 | 312.30 | 139.12 | 84,075.52 | 13,870.26 |
| 44 | 10/01/10 | 84,075.52 | 311.78 | 139.63 | 83,935.89 | 14,182.04 |
| 45 | 11/01/10 | 83,935.89 | 311.26 | 140.15 | 83,795.73 | 14,493.30 |
| 46 | 12/01/10 | 83,795.73 | 310.74 | 140.67 | 83,655.06 | 14,804.04 |
| 47 | 01/01/11 | 83,655.06 | 310.22 | 141.19 | 83,513.87 | 15,114.27 |
| 48 | 02/01/11 | 83,513.87 | 309.70 | 141.72 | 83,372.16 | 15,423.96 |
| 49 | 03/01/11 | 83,372.16 | 309.17 | 142.24 | 83,229.92 | 15,733.13 |
| 50 | 04/01/11 | 83,229.92 | 308.64 | 142.77 | 83,087.15 | 16,041.78 |
| 51 | 05/01/11 | 83,087.15 | 308.11 | 143.30 | 82,943.85 | 16,349.89 |
| 52 | 06/01/11 | 82,943.85 | 307.58 | 143.83 | 82,800.02 | 16,657.48 |
| 53 | 07/01/11 | 82,800.02 | 307.05 | 144.36 | 82,655.66 | 16,964.53 |
| 54 | 08/01/11 | 82,655.66 | 306.51 | 144.90 | 82,510.76 | 17,271.04 |
| 55 | 09/01/11 | 82,510.76 | 305.98 | 145.44 | 82,365.33 | 17,577.02 |
| 56 | 10/01/11 | 82,365.33 | 305.44 | 145.97 | 82,219.35 | 17,882.46 |
| 57 | 11/01/11 | 82,219.35 | 304.90 | 146.52 | 82,072.84 | 18,187.35 |
| 58 | 12/01/11 | 82,072.84 | 304.35 | 147.06 | 81,925.78 | 18,491.71 |
| 59 | 01/01/12 | 81,925.78 | 303.81 | 147.60 | 81,778.17 | 18,795.52 |
| 60 | 02/01/12 | 81,778.17 | 303.26 | 148.15 | 81,630.02 | 19,098.78 |

LoanAmortizationTable.xls

# EXHIBIT  4

Subj:      **(no subject)**
Date:      6/27/2007 4:08:14 P.M. Eastern Daylight Time
From:      JALEL
To:        dguzman@agattys.com
BCC:       elkindd@dicksteinshapiro.com

**FOR SETTLEMENT PURPOSES ONLY**

Denise:

  You have asked me to set forth my net worth. The following is a rough estimate of my net worth that is being provided to you solely to further our settlement negotiations, and is to be used for no other purposes. Furthermore, it is to be kept strictly confidential.

  As you know, my sole asset is my house (I have about $1,000 in the bank, about $6,000 in an IRA, a 1994 car and a 2001 car, both with over 80,000 miles).

  I have asked some real estate brokers in the area what they estimate the value of my house to be. They have come back with estimates of $750,000 to $800,000. Using the high end of $800,000, I would net approximately $591,500 from a sale as follows:

$800,000
  LESS:
  ($40,000) brokerage commission
  ($3,200) transfer tax
  ($65,296) state and federal capital gains tax ($756,800 net, less $250,000 basis
     and $250,000 exclusion times 22%)
  ($100,000) mortgage
$591,504

  I am still facing 6 years of college tuition, a substantial portion of which may have to be borrowed against my house, so the $591,500 may be substantially less by the time Alex and Lizzie are finished with college.

  With the net proceeds of my house (whatever is left), I would have to find alternate housing and an office. Right now the house is in need of repair. Whether or not I sell the house, the back of the house is peeling and needs to be repainted, it needs a new roof, a new driveway, a new furnace and, I believe, mold abatement from the flood.

  I still await your letter to me of April 2003.

  This communication is presented for settlement purposes only and is not to be utilized in any legal proceeding or arbitration of this matter. It is to be kept strictly confidential. I write this communication without prejudice to my potential claims and with full reservation of all rights

  I look forward to resolving this with you.

See what's free at AOL.com.

Wednesday, June 27, 2007 America Online: JALEL

EXHIBIT  5

Subj:    **More ideas...**
Date:    6/7/2007 5:20:45 P.M. Eastern Daylight Time
From:    dguzman@agattys.com
To:    JALEL@aol.com

Jaine,
I have been thinking about our conversation yesterday. And if we are
going to resolve this matter I need to get both parties in the frame of
mind to do it. I will talk with Al. But I also need you to take
responsibility for this situation. Because both you and Al failed to
get anything in writing regarding each of your understandings of the
money's being transferred. You yourself stated that to me. But
yesterday in our last conversation I heard only that you felt this was
Al's fault and that Al kept changing the rules on you.

I still need to know what the amount of your line of credit is and what
you think the equity is in your property. As I told you yesterday I
will recommend to Al that the principal of the note be payable at the
time the house is sold or upon your death.

Will call you tomorrow afternoon. I have a 9:30, 11:00 and Noon
meeting set. Will try calling you in between or after the Noon
meeting.

Denise
PLEASE NOTE MY NEW EMAIL ADDRESS:
dguzman@agattys.com

DENISE M. GUZMAN
ARTIANO GUZMAN, LLP
3828 Carson St., Ste 102
Torrance, Ca. 90503
310. 543-1240 Tel
310. 543-9850 Fax

ATTORNEY-CLIENT PRIVILEGE / WORK PRODUCT: This message and any
accompanying documents is for the personal and exclusive use of the
recipient(s) named above. It contains confidential information from
the law offices of ARTIANO, GUZMAN, LLP. If you have received this
transmission and are not the IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT,
please be advised that any disclosure, use, review, copying, selling,
dissemination publication or distribution of this transmission is
unauthorized and prohibited.

IF YOU HAVE RECEIVED THIS TRANSMISSION AND ARE NOT THE IDENTIFIED
RECIPIENT(S) OR HIS/HER AGENT, PLEASE NOTIFY US IMMEDIATELY BY
TELEPHONE AND DELETE THIS TRANSMISSION.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS
IMPOSED BY THE IRS, WE INFORM YOU THAT ANY TAX ADVICE CONTAINED IN THIS
COMMUNICATION (INCLUDING ANY ATTACHMENTS) WAS NOT INTENDED OR WRITTEN
TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (i) AVOIDING
TAX-RELATED PENALTIES UNDER FEDERAL, STATE OR LOCAL TAX LAW OR (ii)
PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION
OR MATTER ADDRESSED HEREIN.=

EXHIBIT 6

**Subj:** Re:Loans
**Date:** 10/9/2007 11:17:52 A.M. Eastern Daylight Time
**From:** dguzman@agattys.com
**To:** JALEL@aol.com

Jaine,
The reason you have not heard from me is that Al, Bernie and I have been looking at this transaction from every possible way in order to minimize the tax liability to Al. No matter how we look at this transaction, as long as the note is not incurring a legal rate of interest there will be income inpuned to Al. The current terms that you and I discussed will cost Al $ 2000 that he will have to pay in taxes. Even if we say that he will gift you the difference between the $ 50/mo payment and the legal rate of interest imposed by the IRS, he must declare the income and pay taxes on it.

Here is what we would like to propose. Al would like there to be an end to this situation at a date certain. Our proposal is as follows:
1. Settlement of $ 150,000 secured by a mortgage note and deed on your residence (in first position)
2. No monthly payments
3. Payment of $ 150,000 in five years and interest is forgiven.

Think about it Jaine. Al is willing to pay taxes on the interest income he does not receive, in return, he would like the principal of the note to be paid with a date certain. Both Julie and Al do not want this arrangement to hang over everyone's head for a lengthy period. Al figured Lizzie would be out of college in five years and if you had to re-fi, you would not have the burden of college tuition as an expense at that time.

I will be in the office all day on Wednesday. We will talk then.
Denise
On Oct 8, 2007, at 12:30 PM, JALEL@aol.com wrote:

> Hi Denise:
> I hope you enjoyed your trip to NY.
> I hope you are not working on the holiday today. I will be in meetings tomorrow.
> Let's speak on Wednesday so we can "catch up" on where we are and finish this matter.
> Jaine

See what's new at AOL.com and Make AOL Your Homepage.

**PLEASE NOTE MY _NEWEST_ EMAIL ADDRESS:**
*dguzman@guzmanlou.com*

DENISE M. GUZMAN
GUZMAN & LOU, LLP
3828 Carson St., Ste 102
Torrance, Ca. 90503
310. 543-1240 Tel
310. 543-9850 Fax

ATTORNEY-CLIENT PRIVILEGE / WORK PRODUCT: This message and any accompanying documents is for the personal and exclusive use of the recipient(s) named above. It contains confidential information from the law offices of GUZMAN & LOU, LLP. If you have received this transmission and are not the IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, please be advised that any disclosure, use, review, copying, selling, dissemination publication or distribution of this transmission is unauthorized and prohibited.

IF YOU HAVE RECEIVED THIS TRANSMISSION AND ARE NOT THE IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DELETE THIS TRANSMISSION.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE

EXHIBIT  7

Subj: **Settlement Agreement and Mortgage note...**
Date: 11/20/2007 8:49:45 P.M. Eastern Standard Time
From: dguzman@guzmanlou.com
To: JALEL@aol.com

Jaine,
I have conveyed to Al and Julie the status of our discussions to date and the discussions that you have had with your tax attorney regarding the imputed income to Al (re the interest rate) and the differential amount re the settled amount and the amount that Al has claimed on the books these past years. I think that you and I have covered all the issues at this point and as I stated to you yesterday, there is an urgency to wrapping up these negotiations.

Please prepare a settlement agreement and a mortgage note with your proposed offer. Please execute it and deliver it to my office by December 5th. Both Julie and Al have asked for this deadline date.

Please call me if you have any questions.

Denise
**PLEASE NOTE MY _NEWEST_ EMAIL ADDRESS:**
dguzman@guzmanlou.com

DENISE M. GUZMAN
GUZMAN & LOU, LLP
3828 Carson St., Ste 102
Torrance, Ca. 90503
310. 543-1240 Tel
310. 543-9850 Fax

ATTORNEY-CLIENT PRIVILEGE / WORK PRODUCT: This message and any accompanying documents is for the personal and exclusive use of the recipient(s) named above. It contains confidential information from the law offices of GUZMAN & LOU, LLP. If you have received this transmission and are not the IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, please be advised that any disclosure, use, review, copying, selling, dissemination publication or distribution of this transmission is unauthorized and prohibited.

IF YOU HAVE RECEIVED THIS TRANSMISSION AND ARE NOT THE IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DELETE THIS TRANSMISSION.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (i) AVOIDING TAX-RELATED PENALTIES UNDER FEDERAL, STATE OR LOCAL TAX LAW OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

=

EXHIBIT  8

Subj:    **Settlement Offer**
Date:    12/7/2007 2:15:44 P.M. Eastern Standard Time
From:    dguzman@guzmanlou.com
To:       JALEL@aol.com

Jaine,
The offer on the table is your $ 50/mo interest only payments, all principal due in 15 years or upon your death or sale of the property.  There is nothing to discuss regarding these terms.  Please revise your mortgage deed and note to reflect the same.  I need all documents in my office by Monday including the settlement agreement.
Denise

**PLEASE NOTE MY _NEWEST_ EMAIL ADDRESS:**
dguzman@guzmanlou.com

DENISE M. GUZMAN
GUZMAN & LOU, LLP
3828 Carson St., Ste 102
Torrance, Ca. 90503
310. 543-1240 Tel
310. 543-9850 Fax

ATTORNEY-CLIENT PRIVILEGE / WORK PRODUCT: This message and any accompanying documents is for the personal and exclusive use of the recipient(s) named above.  It contains confidential information from the law offices of  GUZMAN & LOU, LLP. If you have received this transmission and are not the IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, please be advised that any disclosure, use, review, copying, selling, dissemination  publication or distribution of this transmission is unauthorized and prohibited.

IF YOU HAVE RECEIVED THIS TRANSMISSION AND ARE NOT THE IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DELETE THIS TRANSMISSION.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (i) AVOIDING TAX-RELATED PENALTIES UNDER FEDERAL, STATE OR LOCAL TAX LAW OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

=

EXHIBIT  9

**JAINE ELKIND ENEY**
**9 KILMER ROAD**
**LARCHMONT, NEW YORK 10538**
**PHONE (914) 834-0184  FAX (914) 834-9184**

**FOR SETTLEMENT PURPOSES ONLY**

**DATE:  December 11, 2007**

**TO:      Denise M. Guzman**

**FAX NO:  (310) 543-9850**

**RE:  Al Larson**

**NUMBER OF PAGES (including cover): 8**

**MESSAGE:**
Hi Denise:

I am transmitting herewith drafts for discussion purposes of the proposed settlement agreement, note and mortgage (paragraph 11 the mortgage contains the due on sale and death clauses) for your review. As you know, the proposed note and mortgage have to be approved by Wells Fargo, and I want you to see them before I send them to the bank.

This memo with attached documents is presented for settlement purposes only and is not to be utilized in any legal proceeding or arbitration of this matter.  I write this letter without prejudice to my potential claims and with full reservation of all rights

Jaine

# SETTLEMENT AGREEMENT

Agreement made as of this        day December 2007 between **ALLAN S. LARSON ("Larson")** residing at  1260 Century Park East, Apt. 1702, Century City, Ca. 90067 and **JAINE ELKIND ENEY ("Eney")** residing at  9 Kilmer Road, Larchmont, NY  10538

# W I T N E S S E T H

**WHEREAS Larson** and **Eney** have had differing views as to the amount, if any, that **Eney** owes to **Larson**; and

**WHEREAS** the parties are interested in resolving the outstanding claims and possible counter claims that the parties have with each other.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements herein contained the parties agree as follows:

1.  To compromise and settle their outstanding claims by agreeing that the amount owed by **Eney** to **Larson** is the sum of $150,000.

2.  **Eney** shall pay **Larson** the $150,000 by signing a Promissory Note in the amount of $150,000 with interest at four tenths of one percent (0.4%) per annum due January 1, 2023 in the form annexed hereto as Exhibit A, and to provide **Larson** with security with regard to payment of the Note by **Eney** signing a first mortgage on her residence at 9 Kilmer Road in favor of **Larson** which shall be a first lien upon the property in the form annexed hereto as Exhibit B.  However, signing this mortgage is subject to **Eney** first obtaining approval of the Note and Mortgage by Wells Fargo.

3.  The parties agree that the payment of $150,000 shall be in full and complete satisfaction of any and all claims that **Larson** might or hereafter have had against **Eney** up to this date of this Agreement and **Larson** hereby fully releases and forever discharges **Eney**, the heirs, executors, successors and assigns of **Eney** from all claims or causes of action **Larson** might have against **Eney** from the beginning of time up to the date of this Agreement..

4.  No income shall be imputed to **Eney** as a result of this Agreement.  The parties agree that this Agreement shall not be considered a cancellation of indebtedness. **Larson** will take no steps or actions to create any taxable income or tax consequences to **Eney** related to this Agreement

5.  The parties agree that this Agreement shall be governed by, and construed in accordance with, the law of the State of New York without giving effect to the conflicts of law principles thereof, and shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, personal or legal representatives and permitted assigns.

6.  This Agreement may not be changed or terminated orally.


   **IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first above written.


_____

**Allan S. Larson**


_____

**Jaine Elkind Eney**

**UNIFORM ACKNOWLEDGMENT TAKEN WITHIN NEW YORK STATE**

STATE OF NEW YORK          )
                                   :.ss.:

COUNTY OF                )

      On the     day of  December, in the year 2007, before me, the undersigned, personally appeared **JAINE ELKIND ENEY,**  personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____<br>NOTARY PUBLIC

**UNIFORM ACKNOWLEDGMENT TAKEN OUTSIDE NEW YORK STATE**

STATE OF  CALIFORNIA       )
                                   :.ss.:

COUNTY OF                )

      On the     day of             , in the year 2007, before me, the undersigned, personally appeared **ALLAN S. LARSON**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in

_____.
(insert the city or other political subdivision and the state or country or other place the acknowledgment was taken).

_____<br>NOTARY PUBLIC

$150,000.                                                        Dated: December , 2007

## NOTE

For value received, **Jaine Elkind Eney** ("Borrower"), residing at 9 Kilmer Road, Larchmont, New York 10538, promises to pay to the order of **Allan S. Larson** ("Lender") at 1260 Century Park East, Apt 1702 Century City, Ca. 90067 or such other place as may be designated in writing by Lender, in lawful money of the United States, the principal sum of one hundred fifty thousand and 00/100 Dollars ($150,000.00) with interest on the principal sum outstanding from the date hereof until paid.

The rate of interest under this Note shall be 4/10 of 1% (0.4%) per annum. Borrower will make monthly payments of $50 of interest only on the unpaid principal amount, with the first installment due and payable on February 1, 2008, and all subsequent installment payments will be due and payable on the first day of each and every month thereafter until January 1, 2023 (the "Maturity Date") when the entire remaining principal balance of this Note, if any, will be due and payable in full.

This Note may be prepaid in whole at any time or in part from time to time, without premium or penalty.

If the Borrower does not pay the full amount of each monthly interest payment by the end of fifteen calendar days after the date it is due, Borrower will be in default. If Borrower is in default, Lender may send Borrower written notice that if the overdue amount is not paid within thirty days of said notice, Lender may require Borrower to pay immediately all principal and accrued and unpaid interest owing under this Note. No waiver by the Lender of its right to require immediate payment in full as described in the foregoing sentence will be deemed a waiver by the Lender of its right to do so if Borrower is in default at a later time. If Lender requires immediate payment in full, the Borrower agrees to pay all costs and expenses incurred by the Lender in the collection of this Note (including reasonable attorneys' fees).

Any notice that must be given to Borrower under this Note will be given by delivering it or by mailing by first class mail to the Borrower at the address set forth above (or at such other address as the Borrower notifies the Lender in writing). Any notice that must be given to Lender under this Note will be given by delivering it or by mailing by first class mail to the Lender at the address set forth above (or at such other address as the Lender notifies the Borrower in writing).

This Note shall be governed by and construed in accordance with the laws of the State of New York.

This Note can not be changed or terminated orally.

The Borrower waives presentment and notice of dishonor.

This Note is secured by a mortgage made by the Borrower to the Lender of even date herewith on property situate in the Village of Larchmont, Town of Mamaroneck, County of Westchester and State of New York commonly known as 9 Kilmer Road, Larchmont, NY 10538

_____
Jaine Elkind Eney, Borrower

— First Mortgage – Individual or Corporation

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT
SHOULD BE USED BY LAWYERS ONLY.

---

**THIS MORTGAGE,** made the       day of   December in the year   2007
**BETWEEN**

**JAINE ELKIND ENEY residing at 9 Kilmer Road, Larchmont, NY 10538**

, the mortgagor,

and

**ALLAN S. LARSON   residing at 1260 Century Park East, Apt 1702 Century City, Ca. 90067**

, the mortgagee,

**WITNESSETH,** that to secure the payment of an indebtedness in the sum of **ONE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS**, lawful money of the United States, to be paid with interest thereon to be computed from the date hereof, at the rate of  4/10 of 1% (0.4%) per annum, and to be paid according to a certain bond, note or obligation bearing even date herewith, the mortgagor hereby mortgages to the mortgagee

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Village of Larchmont, Town of Mamaroneck, County of Westchester and State of New York more particularly described on Schedule A annexed hereto and made a part hereof.

TOGETHER with all right, title and interest of the mortgagor in and to the land lying in the streets and roads in front of and adjoining said premises;

TOGETHER with all fixtures, chattels and articles of personal property now or hereafter attached to or used in connection with said premises, including but not limited to furnaces, boilers, oil burners, radiators and piping, coal stokers, plumbing and bathroom fixtures, refrigeration, air conditioning and sprinkler systems, wash-tubs, sinks, gas and electric fixtures, elevators, motors, dynamos, incinerators, plants and shrubbery and all other equipment and machinery, fittings, and fixtures of every kind in or used in the operation of the buildings standing on said premises, together with any and all replacements thereof and additions thereto;

TOGETHER with all awards heretofore and hereafter made to the mortgagor for taking by eminent domain the whole or any part of said premises or any easement therein, including any awards for changes of grade of streets, which said awards are hereby assigned to the mortgagee, who is hereby authorized to collect and receive the proceeds of such awards and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the mortgage debt, notwithstanding the fact that the amount owing thereon may not then be due and payable after they are applied to the repair or restoration of the premises; and the said mortgagor hereby agrees, upon request, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning said awards to the mortgagee, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

AND the mortgagor covenants with the mortgagee as follows:

1. That the mortgagor will pay the indebtedness as hereinbefore provided.

2. That the mortgagor will keep the buildings on the premises insured against loss by fire; and that he will reimburse the mortgagee for any premiums paid for insurance made by the mortgagee on the mortgagor's default in so insuring the buildings. All insurance proceeds will be used for the repair or restoration of the premises.

3. That no building on the premises shall be, totally removed or demolished by mortgagor without the consent of the mortgagee.

4. That the whole of said principal sum shall become due at the option of the mortgagee: after default in the payment of any installment of principal; or after default in the payment of any tax, water rate, sewer rent or assessment for thirty days after notice and demand.

5. That the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver.

6. That the mortgagor will pay all taxes, assessments, sewer rents or water rates, and in default thereof, the mortgagee may pay the same.

7. That notice and demand or request may be in writing and may be served in person or by mail.

8. That the mortgagor warrants the title to the premises.

.9. That in case of a foreclosure sale, said premises, or so much thereof as may be affected by this mortgage, may be sold in one parcel.

10. That if any action or proceeding be commenced (except an action to foreclose this mortgage or to collect the debt secured thereby), to which action or proceeding the mortgagee is made a party, or in which it becomes necessary to defend or uphold the lien of this mortgage, all reasonable sums paid by the mortgagee for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees), shall be paid by the mortgagor and any such sum shall be a lien on said premises, prior to any right, or title to, interest in or claim upon said premises attaching or accruing subsequent to the lien of this mortgage, and shall be deemed to be secured by this mortgage. In any action or proceeding to foreclose this mortgage, or to recover or collect the debt secured thereby, the provisions of law respecting the recovering of costs, disbursements and allowances shall prevail unaffected by this covenant.

11. That the whole of said principal sum shall become due at the option of the mortgagee: (a) after failure to exhibit to the mortgagee, within thirty days after demand, receipts showing payment of all taxes, water rates, sewer rents and assessments; or (b) after the actual or threatened, total demolition or removal of any building on the premises by mortgagor without the written consent of the mortgagee; or (c) if all or any part of the premises is sold without Lender's prior written permission; or (d) one (1) year after the death of mortgagor; or (e) after failure to comply with any requirement or order or notice of violation of law or ordinance issued by any governmental department claiming jurisdiction over the premises within three months from the issuance thereof; or (f) if on application of the mortgagee two or more fire insurance companies lawfully doing business in the State of New York refuse to issue policies insuring the buildings on the premises.

13. When Mortgagee has been paid all amounts due under the note and under this mortgage, Mortgagee will discharge this mortgage by delivering a certificate in proper form, duly executed and acknowledged for recording stating that this mortgage has been satisfied.

14. That the mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

This mortgage may not be changed or terminated orally. The covenants contained in this mortgage shall run with the land and bind the mortgagor, the heirs, personal representatives, successors and assigns of the mortgagor and all subsequent owners, encumbrances, tenants and subtenants of the premises, and shall inure to the benefit of the mortgagee, the personal representatives, successors and assigns of the mortgagee and all subsequent holders of this mortgage. The word "mortgagor" shall be construed as if it read "mortgagors" and the word "mortgagee" shall be construed as if it read "mortgagees" whenever the sense of this mortgage so requires.

IN WITNESS WHEREOF, this mortgage has been duly executed by the mortgagor.

**IN PRESENCE OF:**

STATE OF NEW YORK, COUNTY OF
WESTCHESTER

On the        day of December in the year  2007,
before me, the undersigned, personally appeared
JAINE ELKIND ENEY
                     , personally known to me or
proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is
(are) subscribed to the within instrument and
acknowledged to me that he/she/they executed
the same in his/her/their capacity(ies), and that
by his/her/their signature(s) on the instrument,
the individual(s), or the person on behalf of
which the individual(s) acted, executed the
instrument.

to the within instrument and acknowledged to me
that he/she/they executed the same in
his/her/their capacity(ies), and that by
his/her/their signature(s) on the instrument, the
individual(s), or the person on behalf of which
the individual(s) acted, executed the instrument
    [add the following if the acknowledgment is
        taken outside NY State]
and that said individual made such appearance
before the undersigned in the (insert the city or
other political subdivision and the State or
country or other place the acknowledgment was
taken).

STATE OF

On the        day of                in the year
, before    me,    the    undersigned,
personally appeared

                     , personally known to me or
proved to me
on the basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed

MORTGAGE

Title No. _____

JAINE ELKIND ENEY

TO

ALLAN S. LARSON

SECTION
BLOCK
LOT
COUNTY OR TOWN

RETURN BY MAIL TO:

Distributed By
**Chicago Title Insurance Company**

# EXHIBIT  10

| | |
|---|---|
| Subj: | **Settlement Agreement** |
| Date: | 1/2/2008 9:03:42 P.M. Eastern Standard Time |
| From: | dguzman@agattys.com |
| To: | JALEL@aol.com |

Jaine,

I had several issues with the language in your settlement agreement.  You had represented that your tax attorney would be working on a settlement agreement that was favorable to both parties regarding the tax consequences of this settlement.   I did not find that to be the case.  We now have our tax attorney working on the structure for the settlement agreement and suggested language.

I will contact you as soon as I have something additional to discuss with you.

Denise

**PLEASE NOTE MY *NEWEST* EMAIL ADDRESS:**
*dguzman@guzmanlou.com*

DENISE M. GUZMAN
GUZMAN & LOU, LLP
3828 Carson St., Ste 102
Torrance, Ca. 90503
310. 543-1240 Tel
310. 543-9850 Fax

ATTORNEY-CLIENT PRIVILEGE / WORK PRODUCT: This message and any accompanying documents is for the personal and exclusive use of the recipient(s) named above.  It contains confidential information from the law offices of  GUZMAN & LOU, LLP. If you have received this transmission and are not the IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, please be advised that any disclosure, use, review, copying, selling, dissemination  publication or distribution of this transmission is unauthorized and prohibited.

IF YOU HAVE RECEIVED THIS TRANSMISSION AND ARE NOT THE IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DELETE THIS TRANSMISSION.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (i) AVOIDING TAX-RELATED PENALTIES UNDER FEDERAL, STATE OR LOCAL TAX LAW OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

=

EXHIBIT  11

Subj:    **Re: Settlement Agreement**
Date:    1/3/2008
To:      dguzman@agattys.com

Denise:
I have your email.
As usual, I disagree with your recollection of past events, but look forward to receiving your comments.
Regards,
Jaine

# EXHIBIT  12

| Subj: | **Settlement** |
|---|---|
| Date: | 5/12/2008 |
| To: | dguzman@guzmanlou.com |
| BCC: | elkindd@dicksteinshapiro.com |

Denise:
It has been over five months since, in order to avoid litigation, we reached settlement of the dispute between Al Larson and me based on the following terms:
$150,000 principal
$50 per month interest only payments
principal due in 15 years or upon the sale of  the property

I sent you a draft writing to memorialize our agreement five months ago but I haven't heard back from you. Please let me know where things stand.

Jaine

EXHIBIT  13

| Subj: | **Re: Settlement** |
|---|---|
| Date: | 5/14/2008 8:50:08 P.M. Eastern Daylight Time |
| From: | dguzman@guzmanlou.com |
| To: | JALEL@aol.com |
| CC: | jmccoy@guzmanlou.com |

Jaine,

I Fed Ex'd a settlement agreement to you today along with a lengthy letter of explanation pursuant to our tax attorney's advise.  You should be receiving the package tomorrow morning.  The terms are the same.  Please advise if you do not receive it.

Denise

On May 12, 2008, at 6:11 AM, JALEL@aol.com wrote:

> Denise:
> It has been over five months since, in order to avoid litigation, we reached settlement of the dispute between Al Larson and me based on the following terms:
> $150,000 principal
> $50 per month interest only payments
> principal due in 15 years or upon the sale of  the property
>
> I sent you a draft writing to memorialize our agreement five months ago but I haven't heard back from you. Please let me know where things stand.
>
> Jaine

> Wondering what's for Dinner Tonight? Get new twists on family favorites at AOL Food.

DENISE M. GUZMAN
GUZMAN & LOU, LLP
Manhattan Towers
1230 Rosecrans Ave., Ste. 650
Manhattan Beach, CA  90266
T: 310. 321-6640 Ext. 107
F: 310. 321-6641
dguzman@guzmanlou.com
www.guzmanlou.com

ATTORNEY-CLIENT PRIVILEGE / WORK PRODUCT: This message and any accompanying documents is for the personal and exclusive use of the recipient(s) named above.  It contains confidential information from the law offices of  GUZMAN & LOU, LLP. If you have received this transmission and are not the IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, please be advised that any disclosure, use, review, copying, selling, dissemination  publication or distribution of this transmission is unauthorized and prohibited.

IF YOU HAVE RECEIVED THIS TRANSMISSION AND ARE NOT THE IDENTIFIED RECIPIENT(S) OR HIS/HER AGENT, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DELETE THIS TRANSMISSION.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (i) AVOIDING TAX-RELATED PENALTIES UNDER FEDERAL, STATE OR LOCAL TAX LAW OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.